[No. 20591-6-III. Division Three. October 3, 2002.]

THE STATE OF WASHINGTON, *Respondent*, v. ISAIAS RAMIREZ ROMERO, *Appellant*.

*Dennis W. Morgan*, for appellant.

*Ronald S. Zirkle, Prosecuting Attorney*, and *Kenneth L. Ramm, Jr., Deputy*, for respondent.

Brown, C.J. — A jury found Isaias Ramirez Romero guilty of unlawfully possessing a firearm. A trial witness commented on Mr. Romero's constitutional right to remain silent. We conclude the comment was reversible error. In doing so, we establish a framework for analyzing direct and indirect comment issues. Additionally, we reject Mr. Romero's challenge to the State's failure to collect fingerprint evidence and decide the evidence was sufficient to support a conviction. Accordingly, we reverse and remand for a new trial.

## FACTS

The State charged Mr. Romero with one count of unlawful possession of a firearm in the first degree based upon the events described here. At trial, Union Gap police officer Alba Levesque testified that she and another officer responded to a report of shots fired at a mobile home park at around midnight on the evening of July 4, 2001. Using a flashlight, Officer Levesque saw Mr. Romero coming around the front of one of the mobile homes. Because Mr. Romero was holding his right hand behind his body, Officer Levesque repeatedly ordered Mr. Romero to show his hands and step away from the mobile home. Mr. Romero did not comply and ran around the far side of the mobile home. Through windows on the near side of the mobile home, the officers could see Mr. Romero enter the mobile home.

After setting up a perimeter, Officer Levesque and Sergeant Dan Rehfield approached the front door of the mobile home and called repeatedly for its occupants to come outside. Two Hispanic males and one white male came out of the front door and the officers detained them.

Officer Levesque and Sergeant Rehfield entered the mobile home. Sergeant Rehfield found some shotgun shell casings on the ground as they approached the front porch. The officers entered the mobile home and found Mr. Romero and Alex Jimenez lying on a bed with their eyes closed, along with three sleeping children. Mr. Romero later testi-

fied he was asleep. At trial, the State argued he was feigning sleep.

According to Officer Levesque, a description from witnesses from another mobile home led her to identify Mr. Romero as the person shooting the shotgun. Officer Levesque testified Mr. Romero was wearing blue shorts that went below the knee and a grey shirt with a checkered pattern. Officer Levesque identified exhibit 1 as the shirt worn by Mr. Romero at the time of his arrest.

Martel Gonzalez testified he heard a gunshot, looked out his window, and saw Mr. Romero twice shoot a firearm described as a short shotgun without a shoulder stock. Mr. Romero stood among a group of four men as he fired the weapon. It was nighttime but lighting in the area enabled Mr. Gonzalez to see Mr. Romero's face. Mr. Gonzalez said he was positive Mr. Romero was the person firing the shotgun. Mr. Gonzalez testified that Mr. Romero was wearing blue shorts and a blue checkered shirt. Mr. Gonzalez also identified exhibit 1 as the shirt then worn by Mr. Romero.

On cross-examination, Mr. Gonzalez said one other man at the shooting scene wore a plaid shirt and long shorts. Mr. Gonzales also said he "did not concentrate very much" on the men's faces but rather on their actions. Report of Proceedings (RP) at 65. But on redirect, Mr. Gonzalez was "one hundred percent" positive that Mr. Romero was the man shooting the firearm. RP at 68.

Sergeant Rehfield testified that the owner or tenant of the mobile home arrived during the investigation and gave permission to search the residence for weapons. Sergeant Rehfield said the officers searched the exterior and interior of the mobile home because "they did not respond to our questions . . . ." RP at 80. Inside the mobile home, Sergeant Rehfield found a shotgun wrapped in clothing behind a toilet. The shotgun was a short pump action with a pistol grip.

With respect to Mr. Romero's arrest, Sergeant Rehfield testified as follows:

Q: Okay. And what happened there?

A: I brought him into the station and put him in the holding cell, he was somewhat uncooperative, so—

[Defense Counsel]: Your Honor, I would object, I previously objected to that.

The Court: Just respond to the question, sir, please.

A: Okay, we put him into the holding cell, I read him his *Miranda*[1] warnings, which he chose not to waive, would not talk to me.

RP at 82. Mr. Romero did not object to the second answer.

Sergeant Rehfield said they also detained Mr. Jimenez. The Sergeant described Mr. Jimenez as a "fairly large individual, approximately 5'8", wearing a T-shirt." RP at 83. Sergeant Rehfield estimated Mr. Jimenez weighed approximately 200 pounds.

Virginia Martinez, the tenant of the concerned mobile home, gave the officers permission to search her residence for the firearm. Ms. Martinez said she did not keep a firearm in her home. On cross-examination, Ms. Martinez noted a plaid object appearing in exhibits 2 and 3 (the shotgun photos). Ms. Martinez did not recognize the item and was not sure the object in the photograph was actually a shirt "because you cannot actually see what it is." RP at 102. She did indicate the object looked like a shirt belonging to her mother.

According to Detective Monty McNearney's testimony, the spent shotgun casings recovered from the scene matched the shotgun recovered from the mobile home. The State did not have the weapon tested for fingerprints, even though the defense made that request, because Detective McNearney believed it unnecessary in light of the eyewitness and because the shotgun had been mishandled, making an analysis futile.

The State rested. Then, Mr. Romero unsuccessfully moved to dismiss for lack of evidence and for failing to suppress the identification and fingerprint evidence.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Mr. Romero then testified. Mr. Romero admitted the necessary predicate felony. He saw Mr. Jimenez wearing a checkered shirt like the one shown in the photographic exhibits. Mr. Romero suggested the shotgun and the shirt in which it was wrapped belonged to Mr. Jimenez and that it was Mr. Jimenez who fired the weapon. Mr. Romero admitted he fled when confronted by the police because of an outstanding warrant for failure to appear for probation. Later, Mr. Romero saw Mr. Jimenez clad in an undershirt or T-shirt. Mr. Romero denied holding the shotgun and wanted the weapon tested for fingerprints. On cross-examination, Mr. Romero said he weighed about 135 pounds. And he admitted that his shirt did not look exactly like Mr. Jimenez's.

The jury found Mr. Romero guilty as charged. Mr. Romero appealed.

## ANALYSIS

### A. Comment on Mr. Romero's Silence

■ The issue is whether part of Sergeant Rehfield's trial testimony was an impermissible comment on Mr. Romero's exercise of his constitutional right to remain silent and, if so, was the error harmless. Mr. Romero can raise this issue, a manifest error affecting a constitutional right, for the first time on appeal. *State v. Curtis*, 110 Wn. App. 6, 11, 37 P.3d 1274 (2002); *State v. Nemitz*, 105 Wn. App. 205, 214, 19 P.3d 480 (2001); *State v. Rogers*, 70 Wn. App. 626, 630, 855 P.2d 294 (1993); RAP 2.5(a)(3).

■ Mr. Romero's right to silence is derived from the Fifth Amendment, applicable to the States via the Fourteenth Amendment, and article I, section 9 of the Washington Constitution. *State v. Easter*, 130 Wn.2d 228, 238, 922 P.2d 1285 (1996). In Washington, a defendant's constitutional right to silence applies in both pre- and postarrest situations. *Easter*, 130 Wn.2d at 243. In the postarrest context, it is well-settled that it is a violation of due process

for the State to comment upon or otherwise exploit a defendant's exercise of his right to remain silent. *See, e.g.*, *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); *State v. Fricks*, 91 Wn.2d 391, 395-96, 588 P.2d 1328 (1979).

■ The State may not use a defendant's constitutionally permitted silence as substantive evidence of guilt. *State v. Lewis*, 130 Wn.2d 700, 705, 927 P.2d 235 (1996); *Easter*, 130 Wn.2d at 236; *Curtis*, 110 Wn. App. at 11-12. Thus, "[a] police witness may not comment on the silence of the defendant so as to infer guilt from a refusal to answer questions." *Lewis*, 130 Wn.2d at 705.

A respected legal commentator has noted "a fine line between [what] is forbidden and what is allowed." 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 801.46 at 353 (4th ed. 1999). For example, our Supreme Court held it is a violation of the defendant's right to silence for a police officer to testify that the defendant refused to talk to him or her. *See Easter*, 130 Wn.2d at 241 (stating defendant's "right to silence was violated by testimony he did not answer and looked away without speaking" when questioned by officer); *Lewis*, 130 Wn.2d at 706 (finding no error, the court noted that the officer did not testify that the defendant refused to talk). Further, it is unfair for the State to emphasize the defendant's silence in closing argument. *See Easter*, 130 Wn.2d at 242-43.

■ On the other hand, our Supreme Court has reasoned an officer's indirect reference to the defendant's silence is not error absent further comment inferring guilt. *Lewis*, 130 Wn.2d at 705-07. "A comment on an accused's silence occurs when used to the State's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." *Id.* at 707 (citing *Tortolito v. State*, 901 P.2d 387, 391 (Wyo. 1995)). In *Lewis*, the officer did not testify that the defendant refused to talk to him; rather, the officer stated that the defendant told him he was innocent. *Id.* at 706. The Supreme Court held the testimony not to be an error, reasoning in part:

> There was no statement made during any other testimony or during argument by the prosecutor that Lewis refused to talk with the police, nor is there any statement that silence should imply guilt. Most jurors know that an accused has a right to remain silent and, absent any statement to the contrary by the prosecutor, would probably derive no implication of guilt from a defendant's silence.

*Lewis*, 130 Wn.2d at 706 (citing *Tortolito*, 901 P.2d at 390).

Consistently, the Supreme Court later held no reversible error existed when an officer testified the defendant said he would be willing to take a polygraph examination after he had discussed the matter with his attorney. *See State v. Sweet*, 138 Wn.2d 466, 480-81, 980 P.2d 1223 (1999). The Supreme Court characterized the officer's testimony as nothing more than a reference to silence. *Id.* at 481.

But, Division Two of this court held it reversible error for a detective to testify that the defendant did not contact her after being warned she would turn the case over to the prosecutor's office if she did not hear from him again. *See State v. Keene*, 86 Wn. App. 589, 594, 938 P.2d 839 (1997). "[T]he detective's comment violated the defendant's right to silence." *Id.*

More recently, this court held it reversible error for a testifying officer to describe an attorney's business card the defendant had given him; the card explained the holder's rights if stopped by an officer. *See Nemitz*, 105 Wn. App. at 213-15. As this court reasoned:

> Here, there was no probative value to the information contained on the lawyer's card regarding appropriate constitutional rights. The only value of the card was its inference that only a person disposed to drink and drive would take anticipatory steps to avoid self-incrimination and to assert the right to counsel in the context of a DUI [driving under the influence] stop.

*Id.* at 215.

Similarly, this court reversed a conviction where an officer testified that he had read the defendant his *Miranda* rights and that the defendant refused to talk to him and

wanted an attorney. *Curtis*, 110 Wn. App. at 9, 13-16. This court reasoned that although the State did not "harp" on the officer's testimony, the "question and answer were injected into the trial for no discernible purpose other than to inform the jury that the defendant refused to talk to the police without a lawyer." *Id.* at 13-14.

The same theme is found in *Douglas v. Cupp*, 578 F.2d 266 (9th Cir. 1978). *See Curtis*, 110 Wn. App. at 14 (discussing *Douglas* with approval). In *Douglas*, the following exchange took place between the prosecutor and a police witness:

"Q. Who arrested Mr. Douglas?

"A. I did.

"Q. Did he make any statements to you?

"A. No.

"Prosecutor: That's all the questions I have."

*Id.* at 267 (quoting Trial Tr. at 158-59).

The Ninth Circuit reasoned such testimony was forbidden under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) and *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). *Douglas*, 578 F.2d at 267. The *Douglas* court also noted that the prosecutor "purposefully elicited the fact of silence in the face of arrest." *Id.* "The introduction of such testimony acted as an impermissible penalty on the exercise of the petitioner's right to remain silent." *Id.* Further:

While perhaps inadvertent, the placement of the suspect question at the end of the arresting officer's testimony gave it a prominence which it would not have had, had it simply been recounted as part of a description of the events culminating in the petitioner's arrest. Thus it is plausible to suppose that a juror might have inferred from the offending testimony that the petitioner was guilty of the crime charged, and that his alibi was a later fabrication and without foundation.

*Id.*

Several principles are apparent. First, it is constitutional error for a police witness to testify that a defendant refused to speak to him or her. *Easter*, 130 Wn.2d at 241. Similarly, it is constitutional error for the State to purposefully elicit testimony as to the defendant's silence. *Id.* at 236; *Curtis*, 110 Wn. App. at 13. It is constitutional error also for the State to inject the defendant's silence into its closing argument. *Easter*, 130 Wn.2d at 236. And, more generally, it is constitutional error for the State to rely on the defendant's silence as substantive evidence of guilt. *Lewis*, 130 Wn.2d at 705.

■ But it is not a constitutional error for a police witness to make an indirect reference to the defendant's silence absent further comment from either the witness or the State. *Lewis*, 130 Wn.2d at 706-07. Such a reference is not reversible error unless the defendant can show resulting prejudice. *Sweet*, 138 Wn.2d at 481; *Lewis*, 130 Wn.2d at 706-07.

■ Considering these authorities, a two-part analytical framework emerges for dealing with the problem of direct and indirect comments from State agents about a defendant's constitutional right of silence. In the first part, if the comment is direct, constitutional error exists that requires a constitutional harmless error analysis. *Easter*, 130 Wn.2d at 241. Thus, in direct comment cases the reviewing court must decide if the error was harmless error beyond a reasonable doubt. *Id.* at 242. The second part, involving indirect comments, is more complicated.

When a comment from a State agent, usually a law enforcement officer, is indirect, three questions should be considered before deciding whether the comment rises to constitutional proportions. First, could the comment reasonably be considered purposeful, meaning responsive to the State's questioning, with even slight inferable prejudice to the defendant's claim of silence? *State v. Curtis*, 110 Wn. App. 6, 13-14, 37 P.3d 1274 (2002). Second, could the comment reasonably be considered unresponsive to a question posed by either examiner, but in the context of the

defense, the volunteered comment can reasonably be considered as either (a) given for the purpose of attempting to prejudice the defense, or (b) resulting in the unintended effect of likely prejudice to the defense? *Douglas*, 578 F.2d at 267. Third, was the indirect comment exploited by the State during the course of the trial, including argument, in an apparent attempt to prejudice the defense offered by the defendant? *State v. Easter*, 130 Wn.2d 228, 236, 922 P.2d 1285 (1996).

Answering "yes" to any of these three questions means the indirect comment is an error of constitutional proportions meriting review using the constitutional harmless error standard, whether or not objection is first made at the trial court. *See Easter*, 130 Wn.2d at 241-42. On the other hand, if "no" is the answer to all three questions and appeal is taken, a nonconstitutional error standard of review applies. *See Sweet*, 138 Wn.2d at 481; *Lewis*, 130 Wn.2d at 706-07.

The trial court may, if objection is offered, consider the claimed error under the trial circumstances and either declare a mistrial or deny mistrial with appropriate corrective instructions. If the trial proceeds and appeal is taken, then the reviewing court can consider the instructions as part of the trial circumstances under the appropriate standard of review, after deciding whether constitutional error is involved.

Here, the State relies heavily on *State v. Johnson*, 42 Wn. App. 425, 712 P.2d 301 (1985). In *Johnson*, a detective testified the defendant did not wish to discuss the case after his arrest. *Id.* at 427 n.1. Division Two of this court held the testimony to be error, but not of constitutional magnitude reasoning in part: "It is only when the prosecutor unfairly uses evidence of post-arrest silence against a defendant that his due process rights to a fair trial are violated." *Id.* at 431 (footnote omitted). The *Johnson* court reasoned that a police witness's mere reference to the defendant's silence will not result in constitutional error unless the State highlights or otherwise exploits the testimony, such as

incorporating it in closing arguments. *See id.* at 431-32. Applying a nonconstitutional harmless error analysis, the *Johnson* court held there was no reasonable probability the error affected the outcome of trial. *Id.* at 432.

The State also relies on a subsequent Division Two case, *State v. Rogers*, 70 Wn. App. 626, 855 P.2d 294 (1993). There, a deputy sheriff testified the defendant replied to questions by stating, " 'I would just as soon leave that.' " *Id.* at 629. Assuming without deciding that the testimony was erroneous, Division Two, relying on *Johnson*, reasoned the error did not rise to constitutional magnitude. *Id.* at 630-31. The *Rogers* court held the error harmless, noting the fleeting and nonjudgmental nature of the testimony, the State's failure to highlight or otherwise exploit the testimony, and further observing that defense counsel's failure to object and ask for a curative instruction "suggests that it was of little moment in the trial." *Id.* at 631.

■ The framework discussed above easily accommodates both the *Johnson* and *Rogers* situations. Under the evolved law, answering the framework questions should aid the trial court when making its record regarding comment challenges as well as guide our scope of review. Here, the Supreme Court has clearly indicated that *any* direct police testimony as to the defendant's refusal to answer questions is a violation of the defendant's right to silence. *Easter*, 130 Wn.2d at 241; *see also Lewis*, 130 Wn.2d at 706. Because we are faced with a direct comment on Mr. Romero's choice of silence in response to questioning, the error is constitutional under part one of the framework. In that sense it is manifest, thus allowing for review for the first time on appeal, and leads us directly to conclude that reversible error exists here. *See Curtis*, 110 Wn. App. at 11-16; *State v. Nemitz*, 105 Wn. App. 205, 214-15, 19 P.3d 480 (2001).

While it is questionable whether the testimony challenged in *Johnson* would pass constitutional muster if decided now, that is unsurprising considering the law has since evolved. *See Easter*, 130 Wn.2d at 241 (reasoning defendant's "right to silence was violated by testimony he

did not answer and looked away without speaking" to testifying officer). The testimony in *Rogers* is more indirect and a closer question, but under part two of the evolved framework, the outcome is consistent. *See Easter*, 130 Wn.2d at 241 (reasoning defendant's right to silence "was also violated by testimony and argument he was evasive").

Applying our framework, Sergeant Rehfield testified directly as to Mr. Romero's postarrest silence: "I read him his *Miranda* warnings, which he chose not to waive, would not talk to me." RP at 82. Sergeant Rehfield prefaced that remark with the observation that Mr. Romero had been "uncooperative." RP at 82. Defense counsel objected to the "uncooperative" comment, but the trial court did not instruct the jury to disregard it. Then, Sergeant Rehfield mentioned the *Miranda* warnings and Mr. Romero's decision not to waive his rights. The Sergeant concluded by observing that Mr. Romero would not talk to him. Even though no objection was taken, Sergeant Rehfield made a direct comment about Mr. Romero's election to remain silent. Thus, constitutional review is clearly warranted.

Even if we were to consider Sergeant Rehfield's comment indirect, by applying the second part of our analysis it would not pass constitutional muster. Although we cannot say the critical prosecution question was in answer to our framework's first question, it was clearly purposeful. Accordingly, Sergeant Rehfield's comment fails the second inquiry. While unresponsive and volunteered, the comment in the context of the circumstance of the trial indicated an attempt by the sergeant to prejudice the defense.

Moreover, we cannot say that prejudice did not likely result due to the undercutting effect on Mr. Romero's defense. Mr. Romero's defense was built around his cooperativeness and openness with nothing to hide, combined with his dispute over the eye witness identification and the surrounding facts. Mr. Romero's testimony and concessions to the jury were likely undermined by Sergeant Rehfield's uncalled-for comment.

In fairness to the State, it did not violate the principle supporting the third question by exploiting the comment. And, the principle supporting the first question also remains intact because the form of the State's question did not call for the specific unresponsive answer given. Thus, the answer given was not purposefully elicited. But, the volunteered answer given by the State agent was likely purposeful in the sense it was intended to denigrate Mr. Romero and undermine his defense. The testimony surrounding Mr. Romero's silence served no probative purpose other than to infer that his silence and lack of cooperation "was more consistent with guilt than with innocence." *Curtis*, 110 Wn. App. at 14.

As just noted, the deputy prosecutor did not clearly elicit the challenged testimony. *Cf. Curtis*, 110 Wn. App. at 13 (noting that witness had not just "blurted out" a reference to the defendant's silence "in response to a question intended to elicit something else."). But he could have seen it coming. Earlier, Sergeant Rehfield commented, without objection, that he and other officers searched for the weapon because "they did not respond to our questions . . . ." RP at 80. "They" likely meant other witnesses besides Mr. Romero and Mr. Jimenez, but that distinction might have been lost to the jury. RP at 80. Either way, the testimony indicated a willingness on the part of Sergeant Rehfield to enter territory forbidden by the Supreme Court.

Then, as noted above, Sergeant Rehfield added the gratuitous comment that Mr. Romero was uncooperative. Given the tone of Sergeant Rehfield's testimony up to that point, a risk existed that the deputy prosecutor's broad question would yield a statement regarding Mr. Romero's exercise of his right to remain silent. Such testimony violated that right. *Easter*, 130 Wn.2d at 242.

"The State bears the burden of showing a constitutional error was harmless." *Id.* An appellate court will find a constitutional error harmless if it is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error and where the

untainted evidence is so overwhelming it necessarily leads to a finding of guilt. *Easter*, 130 Wn.2d at 242; *State v. Aumick*, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995); *State v. Whelchel*, 115 Wn.2d 708, 728, 801 P.2d 948 (1990). "Where the error was not harmless, the defendant must have a new trial." *Easter*, 130 Wn.2d at 242 (citing *State v. Fricks*, 91 Wn.2d 391, 397, 588 P.2d 1328 (1979)).

Here, the State's evidence was not overwhelming; the verdict ultimately turned on the testimony of one eyewitness, Mr. Gonzalez. That testimony was subject to challenge. Mr. Romero wore a grey shirt, but Mr. Gonzalez said the shooter wore a blue shirt. And Mr. Romero said more than one man at the scene wore a plaid shirt. None of the testifying officers saw Mr. Romero with the firearm. Mr. Romero's testimony that Mr. Jimenez wore a blue plaid shirt that he removed before being taken into custody was not entirely inconsistent with Mr. Gonzalez's testimony that another man wore a plaid shirt. And, the shotgun photographs do show a plaid object that could possibly be the shirt Mr. Romero claimed Mr. Jimenez wore. Ms. Martinez's testimony that she did not own a garment like that shown in the photographs was partly consistent with Mr. Romero's theory of the case.

Presented with a credibility contest, the jury could have been swayed by Sergeant Rehfield's testimony, which insinuated Mr. Romero was hiding his guilt. Evidence that Mr. Romero fled and hid in the bedroom compounded the prejudicial effect of the offensive testimony. In sum, a close question exists on the facts; therefore, we cannot say the error was harmless beyond a reasonable doubt. *See Easter*, 130 Wn.2d at 242-43.

## B. Fingerprint Evidence

The issue is whether the trial court should have dismissed the prosecution because the State failed to test the shotgun for potentially useful fingerprint evidence after Mr. Romero's informal request. Because no fingerprint evidence

was collected, Mr. Romero incorrectly casts the issue as a failure to preserve exculpatory evidence. Therefore, our focus is whether the State's failure to test the shotgun for fingerprints was a constitutional error warranting reversal. The State concedes the police did not test the shotgun for fingerprints even though the deputy prosecutor discussed Mr. Romero's request with the responsible forensic agents, but offers the futility of attempting to obtain fingerprints under the circumstances in excuse for noncompliance. Even though we reverse on another point, this issue may be argued again at retrial. Therefore, a brief discussion is now appropriate. *See State v. Stackhouse*, 90 Wn. App. 344, 353, 957 P.2d 218 (1998).

■■ ■■ "To comport with due process, the State has a duty to disclose material exculpatory evidence to the defense and a related duty to preserve such evidence for use by the defense." *State v. Donahue*, 105 Wn. App. 67, 77, 18 P.3d 608, *review denied*, 144 Wn.2d 1010 (2001) (citing *State v. Wittenbarger*, 124 Wn.2d 467, 475, 880 P.2d 517 (1994)). But, the State does not have an affirmative duty to seek out exculpatory evidence or conduct tests to determine the existence of potentially material evidence. *State v. Judge*, 100 Wn.2d 706, 717, 675 P.2d 219 (1984); *State v. Woolbright*, 57 Wn. App. 697, 701-02, 789 P.2d 815 (1990).

■■ ■■ Moreover, the disclosure rule does not apply readily to situations, such as here, where the police simply fail to obtain potential evidence that could be preserved. *See State v. Wasson*, 54 Wn. App. 156, 161, 772 P.2d 1039 (1989) (rejecting defendant's claim that police failure to take photographs prejudiced his defense and noting "[t]he police could not preserve evidence which was never obtained"). Stated another way, Mr. Romero cannot claim the police failed to preserve material evidence when he has not shown that a fingerprint analysis would have turned up any fingerprints at all.

Additionally, the peculiar nature of fingerprint evidence further undermines Mr. Romero's theory. "Fingerprints by their very nature are probative only of the presence of

someone; their absence does not prove the absence of that individual." *State v. Bernhardt*, 20 Wn. App. 244, 247, 579 P.2d 1344 (1978).

Here, unlike in *Bernhardt* where collected fingerprints were destroyed, no one knows whether prints existed on the shotgun. A fingerprint analysis might have revealed Mr. Jimenez's prints, Mr. Romero's, or no prints at all. Mr. Romero's facts are even less persuasive than those found in *Bernhardt*. Had a test revealed Mr. Jimenez's prints, or no prints, the results would not have precluded the possibility that Mr. Romero fired the shotgun. *See Bernhardt*, 20 Wn. App. at 247. Because no reasonable probability exists that the test would have yielded exculpatory evidence, the trial court did not err in denying Mr. Romero's motion to dismiss.

## C. Evidence Sufficiency

The issue is whether sufficient evidence existed to support the conviction. Specifically, Mr. Romero contends insufficient evidence existed to establish his identity as a person in possession of a firearm.

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citing *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980)). "When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Salinas*, 119 Wn.2d at 201 (citing *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201 (citing *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254, *aff'd*, 95 Wn.2d 385, 622 P.2d 1240 (1980)).

■■ ■■ The reviewing court considers circumstantial evidence to be as equally reliable as direct evidence. *State v. Myers*, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997); *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

A person is guilty of first degree unlawful possession of a firearm if that "person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted in this state or elsewhere of any serious offense as defined in this chapter." RCW 9.41.040(1)(a). The existence of the firearm and Mr. Romero's previous conviction are not at issue. The determinative issue is whether there was sufficient evidence that Mr. Romero possessed or had control of the firearm.

Mr. Gonzalez testified without equivocation that he saw Mr. Romero discharge the shotgun twice. Mr. Gonzalez said Mr. Romero wore a plaid shirt and identified the shirt in evidence as the one Mr. Romero wore on the night of the incident. Several officers at the scene identified that same shirt as the one Mr. Romero wore. Although Mr. Romero can point to inconsistencies in this relevant State evidence, clearly it is substantial and does support the conviction. Lastly, the jury decides credibility issues, not review courts. *Camarillo*, 115 Wn.2d at 71.

Reversed and remanded to the trial court for retrial.

SWEENEY and SCHULTHEIS, JJ., concur.