199 P.3d 505 (2009)
STATE of Washington, Respondent,
v.
Kyle Cameron KNAPP, Appellant.
No. 36098-5-II.
Court of Appeals of Washington, Division 2.
January 27, 2009.
*506 Kathryn A. Russell Selk, Russell Selk Law Office, Seattle, WA, for Appellant.
Kathleen Proctor, Pierce County Prosecuting Atty. Office, Tacoma, WA, for Respondent.
BRIDGEWATER, J.
¶ 1 Kyle Cameron Knapp appeals his conviction for residential burglary. We hold that the State committed prosecutorial misconduct by commenting in its closing argument on Knapp's silence. We reverse and remand for a new trial.

FACTS
¶ 2 On November 14, 2006, Darren Blakeslee noticed two suspicious men walking around his Tacoma neighborhood. The men were knocking door to door, sometimes scared off when dogs barked at them. He observed them knock on the door of a house across the street, 1416 South 45th Street. When no one answered, the two men looked at each other and went around the house to the back porch. Blakeslee called 911.
¶ 3 Tacoma Police Department Officers Stephen O'Keefe and Debra Vause responded to the 911 call. They quickly proceeded around the back of the house to investigate the scene. Officer Vause immediately noticed a screen missing from a window by the back deck and she heard voices from inside the house. She signaled to Officer O'Keefe that a burglary was in progress and he called for backup.
¶ 4 One man came out of the house. Then a second man, wearing gloves, came to the door. Officer Vause drew her weapon and ordered the men to put their hands up. The first man complied, but the second man retreated *507 into the house and slammed the door. The officers took the first suspect, later identified as Michael Barton, into custody.
¶ 5 Tacoma Police Department Officer Scott Harris arrived on the scene. He went toward the back of the house and observed a screen "pop out from a window" about eight feet above him. 3 RP at 123. He observed a man start to crawl out of the window. The man and Officer Harris stared at each other for a lingering moment, approximately three to four seconds, before the man retreated back into the house.
¶ 6 Meanwhile, Barton led one of the officers to a white Chevrolet Suburban parked around the corner from the house. Knapp was the registered owner of the vehicle. At some point, the officers went to Knapp's house during the incident to look for him. Knapp was not there, but they did encounter two men that fit Knapp's description. The police officers later impounded the vehicle.
¶ 7 After the officers ran the vehicle plates, Officer O'Keefe stationed himself at the patrol car in front of the house and repeatedly made announcements for "Kyle" to come out of the house. 2 RP at 59. Soon thereafter, a SWAT team arrived and surrounded the house.
¶ 8 Following a long stand-off, the SWAT team searched the property. And later, the officers allowed the owner, Patricia Huggins, inside her home. She discovered a suitcase and duffle bag containing personal items and jewelry near the door. The house was a mess because someone had rifled through all of her personal items. Huggins also noted that it looked like someone either entered or exited through a window. And, the day after the incident, Huggins called the officers to the house because she found the garage attic opened and the garage door opened, suggesting that someone had spent the night inside the house.
¶ 9 On November 16, Knapp called the investigating detective, Dave Hofner, to ask about the whereabouts of his car. Detective Hofner made arrangements to meet Knapp at his residence. During this meeting, Knapp told Detective Hofner that he had been at Carmen Badgley's apartment for the past two days. Knapp then called Badgley over to his house to speak with Detective Hofner. In addition Knapp agreed to let the detective in to search his home. Detective Hofner found nothing of evidentiary value during that search. Knapp also gave Detective Hofner a written statement explaining his whereabouts during the hours of the incident.
¶ 10 Before going to Knapp's house that day, Detective Hofner contacted Blakeslee and asked him to drive by to see if he recognized Knapp. From approximately 25 feet away, Blakeslee observed Detective Hofner speaking with Knapp. Blakeslee later informed the detective that he was "110 percent" certain that the person he was speaking to was one of the two men involved in the burglary. 2 RP at 21. Blakeslee made this in-person identification, despite not having been able to identify Knapp in a photo montage earlier that day.[1]
¶ 11 A few days later, Detective Hofner met Knapp at a towing company. There, Knapp allowed Detective Hofner to search his vehicle. The detective discovered tools such as a hammer, wrenches, screwdrivers, a knife, bolt cutters, cable cutters, and pry bar inside the Suburban.
¶ 12 Detective Hofner also met with Officer Harris to show him a photo montage of suspects. Officer Harris positively identified Knapp as the suspect. The following day, Officer Harris met Detective Hofner at Knapp's house. He positively identified Knapp as the person he had seen inside the Huggins' home. Officer Harris was absolutely certain that Knapp was the suspect he observed trying to climb out of the window of the house. Following Officer Harris's identification, Detective Hofner arrested Knapp.
¶ 13 At trial, the Knapp's defense theory was that during the incident, he was at Badgley's apartment helping her pack and prepare to move. He implied that his roommate *508 took his vehicle without permission and committed the burglary. Knapp testified on his own behalf, as did Badgley. The State's trial theory was that Knapp was the second suspect, spent the night in the Huggins' house, and contacted Detective Hofner the next day regarding his vehicle to provide an alibi. The jury convicted Knapp.

ANALYSIS
¶ 14 Knapp complains that the prosecutor committed misconduct by eliciting testimony that he exercised his right to remain silent and then relied on that testimony in closing argument. We agree.
¶ 15 A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial. State v. Hughes, 118 Wash.App. 713, 727, 77 P.3d 681 (2003) (citing State v. Stenson, 132 Wash.2d 668, 718, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998)), review denied, 151 Wash.2d 1039, 95 P.3d 758 (2004). Prejudice exists if there is a substantial likelihood that the misconduct affected the verdict. State v. McKenzie, 157 Wash.2d 44, 52, 134 P.3d 221 (2006). Where, as here, a defendant does not object or request a curative instruction, he has waived the error unless we find the remark "`so flagrant and ill-intentioned'" that no instruction could have cured the resulting prejudice. McKenzie, 157 Wash.2d at 52, 134 P.3d 221 (quoting State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997), cert. denied, 523 U.S. 1007, 118 S.Ct. 1192, 140 L.Ed.2d 322).
¶ 16 During direct examination in this case, Detective Hofner testified that on November 15, an eyewitness (Blakeslee) positively identified Knapp as the second suspect. The prosecutor then asked, "Okay. What did Mr. Knapp do in response to that, hearing that information?" 2 RP at 73. Detective Hofner stated, "Well, he immediately hung his head but did not say anything." 2 RP at 73. The prosecutor moved on to ask about Detective Hofner's contact with the owner of the burgled property.
¶ 17 Later, but still during direct examination, the prosecutor asked Detective Hofner about an interaction he had with Knapp during his investigation. Detective Hofner testified that he told Knapp that Officer Harris positively identified him as the second suspect. He further testified that he arrested Knapp after that. The prosecutor next asked, "What was Mr. Knapp's immediate reaction to being identified?" 2 RP at 77. Detective Hofner responded, "None, really. Fairly complacent, consistent, seemingly uncaring attitude, but he was cooperative." 2 RP at 77. Thereafter, the prosecutor concluded his direct examination.
¶ 18 Then during closing, the prosecutor argued that a burglary undoubtedly occurred and the only question was whether Knapp was the second suspect. He listed numerous reasons why the jury should find Knapp guilty of the burglary. Among those reasons, the prosecutor stated:
And another reason to believe that this defendant, Kyle Knapp, did the burglary, both times that it was mentioned to him that Darren Blakeslee identified him and then Officer Harris identified him, what did he do? He put his head down. Did he say, "No. It wasn't me"? [sic] No.

3 RP at 179 (emphasis added).
¶ 19 Both the United States and Washington Constitutions guarantee a criminal defendant the right to be free from self-incrimination, including the right to silence. U.S. Const. amend. V; Wash. Const. art. I, § 9. We interpret the two provisions similarly, and liberally construe the right against self-incrimination. State v. Easter, 130 Wash.2d 228, 236, 922 P.2d 1285 (1996). The right against self-incrimination prohibits the State from using a defendant's constitutionally protected silence as substantive evidence of guilt. Easter, 130 Wash.2d at 236, 922 P.2d 1285. The State may not use a defendant's silence to "suggest to the jury that the silence was an admission of guilt." State v. Lewis, 130 Wash.2d 700, 707, 927 P.2d 235 (1996). But the State does have a limited right to use a defendant's silence for impeachment at trial.
¶ 20 The Fifth Amendment prohibits impeachment based on a defendant's exercise of silence where the defendant does not *509 waive the right and does not testify at trial. State v. Burke, 163 Wash.2d 204, 217, 181 P.3d 1 (2008) (citing Griffin v. California, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)). Due process under the Fourteenth Amendment prohibits impeachment based on a defendant's silence after he receives Miranda[2] warnings, even if the defendant testifies at trial. Burke, 163 Wash.2d at 217, 181 P.3d 1 (citing Doyle v. Ohio, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)). But where the defendant testifies at trial, the State may constitutionally use his pre-arrest, pre-warning silence to impeach the defendant. Burke, 163 Wash.2d at 217, 181 P.3d 1.
¶ 21 Knapp testified at trial and denied committing the burglary, asserting that he had an alibi and his truck was stolen. Therefore, the first rule does not apply and the Fifth Amendment does not prohibit the State from commenting on his silence for impeachment purposes. Burke, 163 Wash.2d at 217, 181 P.3d 1. The State, however, could not constitutionally use Knapp's pre-arrest silence as substantive evidence of guilt. Burke, 163 Wash.2d at 217, 181 P.3d 1 (citing Lewis, 130 Wash.2d at 705-06, 927 P.2d 235).
¶ 22 Detective Hofner's testimony in his direct examination, where he commented about Knapp's reaction to Blakeslee's identification, was a comment on Knapp's silence. The State concedes that the prosecutor impermissibly commented on Knapp's silence during closing argument. The State acknowledges that when the prosecutor argued, "[h]e put his head down. Did he say, `No. It wasn't me'? [sic] No," he implied that an innocent person would have denied the accusation. Br. of Resp't at 15 (quoting 3 RP at 179); see also State v. Romero, 113 Wash. App. 779, 787, 54 P.3d 1255 (2002) (stating that it is unfair for the State to emphasize the defendant's silence in closing argument). Indeed, we agree that the prosecutor impermissibly commented on Knapp's silence during closing arguments, suggesting that the jury should infer guilt from his failure to deny the accusation.
¶ 23 Because the prosecutor's closing argument constituted an impermissible comment on Knapp's right to remain silent, the State bears the burden of showing the error was harmless. Easter, 130 Wash.2d at 242, 922 P.2d 1285. A constitutional error is harmless if we are convinced that any reasonable jury would have reached the same result, absent the error. State v. Guloy, 104 Wash.2d 412, 425, 705 P.2d 1182 (1985), cert. denied, 475 U.S. 1020, 106 S.Ct. 1208, 89 L.Ed.2d 321 (1986). We examine only untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. Guloy, 104 Wash.2d at 426, 705 P.2d 1182. Here, we hold that the prosecutor's comment was prejudicial. Washington case law supports this conclusion.
¶ 24 For example, in Romero, Division Three of this court held that the State impermissibly commented on the defendant's post-arrest silence, resulting in prejudice. Romero, 113 Wash.App. at 795, 54 P.3d 1255. The State's witness in Romero testified that after the defendant was arrested and issued his Miranda warnings, he chose not to waive his rights but refused to talk to the investigating officer. Romero, 113 Wash.App. at 793, 54 P.3d 1255. The same witness made a gratuitous comment that the defendant was uncooperative. Romero, 113 Wash.App. at 794, 54 P.3d 1255. Division Three found this was an impermissible comment on the defendant's silence. Romero, 113 Wash.App. at 794, 54 P.3d 1255. And it further held that the error was prejudicial, noting that the case ultimately turned on the testimony of one eyewitness. Romero, 113 Wash.App. at 795, 54 P.3d 1255. In other words, the untainted evidence did not necessarily overwhelmingly lead to guilt.
¶ 25 Similarly, in State v. Keene, 86 Wash. App. 589, 938 P.2d 839 (1997), we found an impermissible comment on the defendant's silence was prejudicial. There, the State charged the defendant with rape of a child. Keene, 86 Wash.App. at 590, 938 P.2d 839. During trial, the prosecutor elicited testimony from the investigating detective that that detective spoke to and exchanged several phone messages with the defendant. Keene, *510 86 Wash.App. at 592, 938 P.2d 839. But eventually, the detective left a message with the defendant, warning him that if he did not get back to her by a certain date, she would turn the case over to the prosecuting attorney's office. Keene, 86 Wash.App. at 592, 938 P.2d 839. The detective never heard from the defendant. Keene, 86 Wash.App. at 592, 938 P.2d 839. The prosecutor referred to this testimony in his closing argument, implying that an innocent person would have returned the detective's call. Keene, 86 Wash.App. at 592, 938 P.2d 839. On appeal, we held that the State's impermissible comment on Keene's silence was prejudicial because the only untainted evidence consisted of the child-victim's testimony, supported by one report one year after the abuse and a second report later. Keene, 86 Wash.App. at 595, 938 P.2d 839. This was not so overwhelming that it necessarily led to a finding of guilt. Keene, 86 Wash.App. at 595, 938 P.2d 839.
¶ 26 Likewise, in Easter, the Washington Supreme Court held that the prosecutor's comment on the defendant's pre-arrest silence was prejudicial. Easter, 130 Wash.2d at 242-43, 922 P.2d 1285. There, the prosecutor elicited testimony from an officer that the defendant did not answer questions and looked away without speaking to the arresting officer. Easter, 130 Wash.2d at 241, 922 P.2d 1285. The prosecutor used this testimony to characterize the defendant as a "smart drunk," repeatedly during closing arguments. Easter, 130 Wash.2d at 242, 922 P.2d 1285. The Supreme Court concluded that the State elicited the initial testimony to support its theory that the defendant was driving the wrong way on a one-way street and invited the jury to infer guilt from the defendant's silence. Easter, 130 Wash.2d at 242, 922 P.2d 1285. Further, it concluded that the error was prejudicial because the untainted evidence  eyewitness testimony and expert opinion testimony  did not overwhelmingly establish the State's theory. Easter, 130 Wash.2d at 242, 922 P.2d 1285.
¶ 27 And recently, in State v. Burke, our Supreme Court again concluded that the prosecutor impermissibly commented on the defendant's silence and the error was prejudicial. Burke, 163 Wash.2d at 206, 181 P.3d 1. The State charged 22-year-old Burke with third degree rape of a child because he had sexual intercourse with a 15-year-old girl. Burke, 163 Wash.2d at 206, 181 P.3d 1. During their investigation, police officers questioned Burke in his home. Burke, 163 Wash.2d at 207, 181 P.3d 1. Burke informed the officers that he had consensual sex with a high school girl, although he did not know her age. Burke, 163 Wash.2d at 208, 181 P.3d 1. At that point, Burke's father ended the interview. Burke, 163 Wash.2d at 208, 181 P.3d 1. He informed the officers that his son would not continue the interview without consulting counsel. Burke, 163 Wash.2d at 209, 181 P.3d 1.
¶ 28 At trial, Burke's defense was that he reasonably believed the victim was 16 years old. Burke, 163 Wash.2d at 208, 181 P.3d 1. He claimed that she told him she was 16, about to turn 17. Burke, 163 Wash.2d at 208, 181 P.3d 1. But the State sought to undermine this defense. Burke, 163 Wash.2d at 208, 181 P.3d 1. During opening and closing arguments, the prosecutor emphasized that if Burke truly thought the victim was 16, he would have told the officers that during the initial interview. Burke, 163 Wash.2d at 208, 181 P.3d 1. The prosecutor also stressed this theory during direct examination of the investigating officers and during its cross-examination of Burke. Burke, 163 Wash.2d at 208, 181 P.3d 1. The jury ultimately convicted Burke of statutory rape. Burke, 163 Wash.2d at 209, 181 P.3d 1.
¶ 29 Our Supreme Court held that the prosecutor did, in fact, impermissibly comment on Burke's silence. Burke, 163 Wash.2d at 222, 181 P.3d 1. Specifically, it found that "the State imputed to Burke the reasons it believed his father gave for ending the interview: a `sense' that Burke's sexual encounter with [the victim] was illegal." Burke, 163 Wash.2d at 222, 181 P.3d 1. The Supreme Court then went on to hold that the error was not harmless. Burke, 163 Wash.2d at 223, 181 P.3d 1. It reasoned that the case turned on whether the jury believed Burke knew the victim's age at the time of the incident and the untainted evidence did not overwhelmingly lead to guilt. Burke, 163 *511 Wash.2d at 222, 181 P.3d 1. Thus, the prosecutor's repeated references to the defendant's guilt could have swayed the jury's verdict. Burke, 163 Wash.2d at 222, 181 P.3d 1.
¶ 30 In the instant case, there was no physical evidence linking Knapp to the burglary-his fingerprints were not discovered, there were no matching tool marks with the tools in his truck, nor was there any DNA evidence linking him to the burglary. Thus, the untainted evidence in this case was not so overwhelming that it necessarily led to a finding of guilt. The State used Knapp's silence as substantive evidence of his guilt.
¶ 31 This case is remarkably on all fours with State v. Holmes, 122 Wash.App. 438, 93 P.3d 212 (2004). In that case the defendant was convicted of child rape and child molestation on the eyewitness, direct testimony of the three child victims. In closing argument, the prosecutor stressed the interviewing officer's testimony that Holmes did not express surprise or deny the charges upon his arrest. The appellate court emphasized that the victims' testimonies were compelling, but it was a credibility issue and the defendant's story was not facially unbelievable. The appellate court then held:
For this reason we are not in a position to say that the jury would necessarily have reached the same result if Holmes' denial of the charges had not been tainted by the improper comments.
Holmes, 122 Wash.App. at 447, 93 P.3d 212.
Following the rationale of Holmes, we hold that the error was prejudicial and not harmless. Although Blakeslee and Officer Harris identified Knapp, there was scant evidence to corroborate the identifications. The case turned on the credibility of Knapp and his alibi witness versus the two witnesses who identified him.
¶ 33 Because we reverse on the basis of prosecutorial misconduct, we do not address other alleged errors.
¶ 34 Reversed and remanded for a new trial.
We concur: HOUGHTON, P.J. and ARMSTRONG, J.
NOTES
[1] Blakeslee testified at trial that because of his personal time constraints, he was not able to review the photo montage thoroughly.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).