

FILED
COURT OF APPEALS
STATE OF WASHINGTON

2015 MAR -9  AM 10: 20

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, ) | DIVISION ONE |
| ) | |
| Respondent, ) | No. 70936-4-I |
| ) | |
| v. ) | UNPUBLISHED OPINION |
| ) | |
| CARLA ANNA FORD, ) | |
| ) | |
| Appellant. ) | FILED: March 9, 2015 |
| _____ ) | |

DWYER, J. — Following a jury trial, Carla Ford was convicted of one count of residential burglary. On appeal, Ford contends (1) that her right to due process was violated by the prosecutor twice improperly commenting on her custodial silence, and (2) that the trial court erred by failing to consider sentencing alternatives before sentencing her to nine months of total confinement. Because evidence of Ford's reaction to police questioning was not improperly admitted and the sentencing issue is moot, we affirm.

I

On December 10, 2012, Scott Nance left his Lake Stevens home to run an errand. When he returned, Nance noticed an unoccupied green Chevrolet pickup truck parked on a gravel road across from his driveway. Nance also noticed that the screen door to his front door was open and a light was on in his

bedroom. Nance did not typically use his front door, and he had turned the light off before he left.

Nance had loaded weapons in his home and was concerned that someone had gotten to them. He pulled out his pistol and went to his front door. He noticed that the lock fell out of the door when he pushed it open. The lock had not previously been broken. When Nance walked in, he saw Shauntel Raymur coming out of his bedroom. Nance pointed his gun at Raymur and asked her what she was doing. Raymur responded, "I'm with her." Nance then heard someone come out of his bathroom and go out the back door. Nance looked out his window and saw Ford running out of his carport. While Nance was distracted, Raymur followed Ford out the back door. The two women ran to a pickup truck parked across the street. Nance telephoned 911. As he did, Ford and Raymur started the truck and drove toward Nance, swerving to avoid him as they drove off.

Nance went back into his house and found that it had been ransacked. Drawers in his bedroom had been dumped out. A box from the spare bedroom had been emptied and Nance's computer, knives, bullets, prescription medication, and other property had been placed in that box. Police arrived on scene about five minutes later.

Three days later, police showed Nance two photo line ups. Nance picked out Raymur and Ford as the two women who had broken into his home without his permission.

A week previously, on December 6, 2012, Francis Schatz had gone outside his home upon hearing his dog bark. Schatz's next door neighbor, Elizabeth Ries, had earlier left for work. However, her son, Nathan Ries, was home studying. Schatz saw a woman get out of a blue Chevrolet pickup truck and walk up to the Ries's front door. Schatz had never before seen that truck in the neighborhood. Ries heard the doorbell ring, but ignored it because he was studying. The woman then walked away from the door, looked toward the backyard, and reentered the passenger side of the pickup truck. The driver was a dark haired woman.

Schatz saw the pickup drive off. Schatz got dressed and left his home, intending to look for the truck. He observed it parked around the corner, unoccupied. Schatz wrote down the license plate number, which he later provided to the police. When Schatz returned home he noticed that Ries's gate and her back door were open. The gate and the door had been closed when Ries left for work. Schatz then called Ries at work to inform her of what he saw. Schatz then drove to get coffee. When he returned, he saw the two women he had previously seen at the Ries's residence walking near that residence. One of the women was carrying a backpack.

When Ries heard from Schatz, she called her son. Ries's son had been listening to music, so he had not heard anyone come into the house. When he went downstairs he noticed that his boots were not where he had left them. Additionally, his binder had been removed from his backpack, and his backpack was gone.

Detective Margaret Ludwig investigated both the Nance and Ries burglaries. She showed Nance and Schatz photomontages. Raymur was picked out by both Nance and Schatz. Nance picked out Ford as one of the women at his house.

Thereafter, Ludwig located Raymur and Ford together at a trailer park. Ford was standing by the truck that had been identified in both burglaries. The truck was impounded and later searched pursuant to a search warrant. Inside the truck, police found backpacks, a crowbar, a police scanner, walkie talkies, a pair of gloves, and some tools. Ludwig testified that, in her experience, burglars use walkie talkies to communicate with one another and use tools like those found in the truck to pry open doors.

The State originally charged Ford with one count of residential burglary, concerning the Nance incident of December 10. The State later amended the information to include an additional count of residential burglary involving the Ries dwelling on December 6. Ford and Raymur were tried together.

During direct examination, the prosecutor asked Ludwig whether she had questioned Ford about a gun having been pulled in the course of the Nance burglary. Ludwig answered that Ford responded to the question by closing her eyes and hanging her head.

Ford presented an alibi defense on both counts, consisting of witnesses testifying that she was someplace else when the burglaries occurred.

A jury found Ford guilty of the Nance burglary but acquitted her of the Ries burglary. The jury returned a special verdict that the victim was present at the

No. 70936-4-I/5

time of the Nance burglary, which qualifies as an aggravating circumstance, RCW 9.94A.535(3)(u), authorizing an exceptional sentence.

The State recommended an exceptional sentence of 12 months confinement. The court imposed a sentence of nine months confinement, the top of the standard range. The court also stated, "I understand this is your first offense, but I believe this is an appropriate sentence and this will be the sentence of the court." This appeal follows.

II

Ford first contends that her right to due process was violated by the State improperly commenting on her exercise of her right to remain silent. This is so, Ford asserts, because the State presented evidence that she closed her eyes and lowered her head in response to a police detective's postarrest, post-Miranda[1] question. We disagree.

Although the defendant did not object to the admission of the evidence she now challenges, we may consider the issue if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). An asserted issue meets this criteria if the claim of error suggests a constitutional issue, and if the appellant has made a plausible showing that the error had a practical and identifiable consequence in the trial of the case. State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992). Here, because a comment on a defendant's exercise of her right to remain silent implicates the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution, the defendant raised a constitutional

_____

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

- 5 -

issue. State v. Romero, 113 Wn. App. 779, 786, 54 P.3d 1255 (2002). Further, because the record is sufficient to determine the merits of that claim, any error would be manifest.

The Fifth Amendment states, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself." This provision applies to the states through the due process clause of the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 8, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). Article I, section 9 states: "[n]o person shall be compelled in any criminal case to give evidence against himself." These two provisions are interpreted equivalently. State v. Easter, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996); accord State v. Earls, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991). The right against self-incrimination is liberally construed. Hoffman v. United States, 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 (1951); Easter, 130 Wn.2d at 236.

The right against self-incrimination prohibits the State from forcing the defendant to testify at trial. Miranda v. Arizona, 384 U.S. 436, 460, 86 S. Ct. 1602 (1966); State v. Foster, 91 Wn.2d 466, 473, 589 P.2d 789 (1979). Moreover, the State may not elicit comments from witnesses or make closing arguments relating to a defendant's silence so as to encourage the jury to infer guilt from such silence. This rule is required because "[a]n accused's Fifth Amendment right to silence can be circumvented by the State 'just as effectively by questioning the arresting officer or commenting in closing argument as by questioning defendant himself.'" Easter, 130 Wn.2d at 236 (quoting State v. Fricks, 91 Wn.2d 391, 396, 588 P.2d 1328 (1979)). However, physical and

demeanor evidence "does not engender Fifth Amendment protection." United States v. Velarde-Gomez, 269 F.3d 1023, 1030 (9th Cir. 2001).

As our Supreme Court explained:

> The Fifth Amendment right to silence extends to situations prior to the arrest of the accused. An accused's right to remain silent and to decline to assist the State in the preparation of its criminal case may not be eroded by permitting the State in its case in chief to call to the attention of the trier of fact the accused's pre-arrest silence to imply guilt.
> Nothing in our conclusion, however, prevents the State from introducing pre-arrest evidence of a non-testimonial nature about the accused, such as physical evidence, demeanor, conduct, or the like.

Easter, 130 Wn.2d at 243; accord Pennsylvania v. Muniz, 496 U.S. 582, 592, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990) (distinguishing "physical" and "demeanor" evidence from "testimonial" evidence).

Demeanor evidence includes, for example, the admission of evidence concerning a defendant's "slurr[ed] speech," Muniz, 496 U.S. at 592, "apparent nervousness," United States v. Barbosa, 906 F.2d 1366, 1368 (9th Cir.1990), or a defendant's demeanor during a polygraph test, even though the results of the test may not be admissible, Rothgeb v. United States, 789 F.2d 647, 651 (8th Cir. 1986).

The distinction between permissible evidence of a defendant's demeanor and improper comments on a defendant's silence is helpfully elaborated by the following two cases: Velarde-Gomez, 269 F.3d 1023, and Michigan v. Rice, 235 Mich. App. 429, 437, 597 N.W.2d 843 (1999). The first addresses when alleged

demeanor evidence is actually commentary on a defendant's silence; the second provides an example of demeanor evidence that was properly admitted.

First, in Velarde-Gomez, the government elicited testimony about the defendant's lack of response when confronted with the 63 pounds of marijuana in his gas tank. 269 F.3d at 1030. The evidence included testimony that the defendant "just sat there" and "didn't look surprised or upset," that "[t]here was no response," and that he did not "say anything" and did not "deny knowledge." Velarde-Gomez, 269 F.3d at 1031. In short, a series of comments each described the same thing—that the defendant did not react at all. Velarde-Gomez, 269 F.3d at 1031.

Sitting en banc, the Ninth Circuit held that, while "[it] agree[d] that the government may offer evidence of demeanor,"[2] the "non-reaction" that the government sought to introduce as demeanor evidence therein was "not an action or a physical response, but a failure to speak. There was no outward physical manifestation to comment upon other than [the defendant's] 'state or condition of silence.'" Velarde-Gomez, 269 F.3d at 1030-31. The court concluded that it was error to admit the evidence of the defendant's "non-reaction," because it allowed the government to comment on his postarrest silence. Velarde-Gomez, 269 F.3d at 1033.

In short, the government may not comment on a defendant's silence in the guise of offering demeanor evidence consisting of a lack of response to

---

[2] The court offered "testimony that [the defendant] was sweating or vomiting" as an example of demeanor testimony that would have been admissible.

questioning. Evidence of a defendant's (non-verbal) demeanor in response to police questioning must focus on the defendant's physical response or reaction— not the lack thereof. This conclusion is entirely consistent with the United States Supreme Court's pronouncement in Miranda that, "[t]he prosecution may not . . . use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation." 384 U.S. at 468 n.37; accord Doyle v. Ohio, 426 U.S. 610, 617, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

Second, in Rice, the trial court admitted the following demeanor evidence from two police interviews: "In the first interview, [the] defendant made some statements, stopped talking, and hung his head down, and then again responded to questioning. In the second interview, . . . [the] defendant merely looked down, nodded, and cried."[3] 235 Mich. App. at 437. The prosecutor then argued in closing that the jury should infer defendant's guilt from his nonverbal conduct during police questioning. In concluding that the officers' testimony concerning defendant's nonverbal conduct and silence was not improper commentary on constitutionally protected silence and that the prosecutor's closing arguments regarding the defendant's nod of his head and outburst of crying were likewise permissible, the court quoted an opinion of that state's Supreme Court:

> "We have found no authority for the proposition that a defendant's nonverbal conduct during interrogation, after a valid waiver of the right to remain silent, is an exercise of that Fifth Amendment right to remain silent or that the 'description of partial silence' in such a setting is an error of constitutional dimension."

---

[3] The defendant waived his Fifth Amendment rights at the outset of each interrogation.

Rice, 235 Mich. App. at 436 (quoting People v. McReavy, 436 Mich. 197, 219-220, 462 N.W.2d 1 (1990)). Thus, nodding, crying—and looking down or hanging one's head—may constitute evidence of demeanor.

The following evidence is at issue in this case: First, the following exchange took place during the State's direct examination of Ludwig:

> Q. You also had a chance to speak to Ms. Ford; is that
> correct?
> A. Correct.
> Q. Did you speak to her about specifics from one or the other
> of the burglaries?
> A. Yes.
> Q. In fact, you asked her about a gun being pulled; is that
> correct?
> A. Yes.
> Q. And that would refer to Mr. Nance?
> A. Correct.
> Q. What was her response or her reaction?
> A. She closed her eyes and hung her head.

The prosecutor also commented on this evidence during closing argument:

> Yes, ladies and gentlemen, they have some innocent explanations. A crowbar can be used for a lot of things. Start adding them up, though, latex gloves, a police scanner? When Carla Ford is questioned and said what about the gun being drawn, what does she do? She hung her head and sighed.
> You hear a crash in the other room, when you go in and ask your kids what happened, and you ask them about kicking that vase off the table and they lower their head and sigh, what do you think your reaction is? What do you think is happening right here in your stomach?

In this case, the prosecutor did not comment on Ford's "silence."[4] Instead, the prosecutor focused on Ford's actions. Specifically, she elicited testimony regarding Ford's physical response—closing her eyes and lowering her head—to a particular question from the police. There was no direct testimony from the officer that Ford did not respond verbally, much less any argument from the prosecutor that the jury should draw a negative inference from such a lack of response.

This fact distinguishes this case from State v. Knapp, 148 Wn. App. 414, 199 P.3d 505 (2009), on which Ford heavily relies. In that case, both the improper testimony from the police officer who had questioned the defendant and the prosecutor's argument from the evidence specifically mentioned that the defendant had not verbally responded to the officer's question—i.e., that he had remained silent.[5] As our Supreme Court has explained, such commenting is improper because

> Miranda warnings implicitly assure the defendant his or her silence will not be used for any purpose once the compulsion of an arrest has occurred. Such silence is "insolubly ambiguous" because the defendant may be exercising the right to silence.

---

[4] In fact, apart from the physical reactions discussed, Ford did also speak—she immediately thereafter asked for an attorney. However, the trial court properly excluded evidence of her invocation of the right to counsel.

[5] The testimony was as follows: "The prosecutor then asked, 'Okay. What did Mr. Knapp do in response to that, hearing that information?' [The detective] stated, 'Well, he immediately hung his head but did not say anything.'" Knapp, 148 Wn. App. at 419.

In closing, the prosecutor argued that the only question was whether Knapp was the second suspect. He listed numerous reasons why the jury should find Knapp guilty of the burglary, including:

> "And another reason to believe that this defendant, Kyle Knapp, did the burglary, both times that it was mentioned to him that Darren Blakeslee identified him and then Officer Harris identified him, what did he do? He put his head down. Did he say, "No. It wasn't me"? [sic] No."

Knapp, 148 Wn. App. at 419-20.

Easter, 130 Wn.2d at 238 (quoting Doyle, 426 U.S. at 617).

Moreover, the only ambiguity raised regarding Ford's physical response to the officer's questioning was whether it expressed dismay at learning that the police had specific information about the alleged crime or annoyance at the line of questioning. As the trial court phrased it, the response could have been meant to express "This is baloney!" This is different from the "insoluble ambiguity" as to whether a defendant was silent because he was guilty or because he was exercising his constitutional right.

The prosecutor in this case did not improperly comment on Ford's "silence." The testimony regarding Ford's physical response to the police questioning was allowable evidence, and the prosecutor's reference to it in closing argument was permissible. The prosecution has wide latitude to relate to the jury the facts adduced at trial and all reasonable inferences arising therefrom. State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Appellate relief is not warranted.

III

Ford next contends that the trial court erred in failing to comply with RCW 9.94A.680, which governs alternatives to total confinement. This is so, she asserts, because the court did not "state its reasons in writing on the judgment and sentence form" when no alternative sentencing was used, as required by the statute. Because Ford has already finished serving her sentence, this issue is moot.

- 12 -

A case is moot when it involves only abstract propositions or questions, the substantial questions in the trial court no longer exist, or a court can no longer provide effective relief. Westerman v. Cary, 125 Wn.2d 277, 286, 892 P.2d 1067 (1994). However, this court has the power to decide a technically moot case to resolve issues of continuing and substantial public interest. State v. Slattum, 173 Wn. App. 640, 647, 295 P.3d 788, review denied, 178 Wn.2d 1010 (2013).

The issue here is moot because the defendant completed serving her sentence by March 2014. Moreover, we will not exercise our discretion to address the issue, notwithstanding its mootness, because it was raised for the first time on appeal. Here, the defendant did not object either when the court did not specifically articulate that it had considered alternatives to total confinement or when it did not put in writing the reasons for not granting her an alternative sentence. Nor did the prosecutor alert the court to the error. There is no indication that the court would have refused to comply with the statutory requirements had it been alerted that it had overlooked those requirements. If the defendant had objected the court easily could have corrected its oversight. We will not speculate on the need for guidance on this issue when it was never raised to the trial court.

Affirmed.

No. 70936-4-I/14

We concur:

_____

_____