IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35554-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NOE RUIZ ROQUE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. —Noe Ruiz Roque challenges on appeal his conviction for felony

harassment, his two convictions for cyberstalking, and features of sentencing on those

three convictions. We grant Ruiz Roque partial relief. We vacate without prejudice for

retrial one of the convictions for cyberstalking. We remand for recalculation of his

offender score and for vacation of some of the legal financial obligations.

FACTS

We garner all facts from a jury trial. Patricia Campos and Noe Ruiz Roque

became Facebook friends. After meeting in person for the first time in April 2017, Ruiz

Roque and Campos spent part of nearly every day together for two months. The dating

relationship led to a sexual relationship. During the relationship, Campos observed Ruiz Roque with a revolver handgun.

In June 2017, Patricia Campos withdrew her affection and presence from Noe Ruiz Roque. In response, Ruiz Roque grew angry and verbally abusive. Ruiz Roque's anger frightened Campos, and she developed concern for her safety and the security of her daughters. Campos then occasionally threatened Campos with not seeing her daughters again.

During the weeks following Patricia Campos' initial attempt to end her relationship with Noe Ruiz Roque, she continued to sporadically visit with him because he told her of the "things he would do if [she] didn't." Report of Proceedings (RP) at 184. Campos continually tried to end the relationship, but Ruiz Roque threw fits so she acquiesced to appease his anger. The fitful behavior included driving recklessly through Campos' neighborhood, banging on Campos' house door sometimes while Campos' daughters slept, and standing near a window at Campos' residence.

Between July 1, 2017 and July 4, 2017, Noe Ruiz Roque dispatched Patricia Campos many text messages in Spanish. Campos claims the text messages contained threats. The content and repetition of the text messages on July 3 and July 4, but not July 1, constitute the facts underlying the criminal charges.

Whether through fear, a wish not to remember, limited command of the English language, or a personality trait, Patricia Campos' trial testimony provided few details

2

about Noe Ruiz Roque's texts.  Campos testified, in part:

> [The State:] Did he threaten to kill you?
> [Patricia Campos:] I don't remember.
> [The State:] Okay.  How many text messages did he send you when you called the police?  How many had he sent you?
> [Patricia Campos:] That night?  Hundreds.
> [The State:] And what about previously?
> [Patricia Campos:] Thousands.
> [The State:] Had you told him that you didn't want to be contacted by him?
> [Patricia Campos:] Yes.

RP at 174-75.

Patricia Campos further testified:

> [The State:] Okay.  Were you ever afraid when he was texting you—did—did he ever threaten you in the texts?
> [Patricia Campos:] Yes.
> [The State:] And were you afraid of those texts?
> [Patricia Campos:] Yes, because I believed what he was saying.
> [The State:] What did you think he could do to you if he wanted to?
> [Patricia Campos:] Exactly what he said.
> [The State:] What was?
> [Patricia Campos:] I don't remember.
> . . . .
> [Patricia Campos:]  . . . I was scared he was going to do what he said.  He said it was like hunting.
> [The State:] Okay.  Were you afraid he was going to hunt you?
> [Patricia Campos:] That's what he said he was doing.
> . . . .
> [The State:] Were you scared?
> [Patricia Campos:] I was more scared for my friends that were there.
> [The State:] Okay.  Was that—do you remember what day that was?
> [Patricia Campos:] No.
> [The State:] Did the text messages continue?
> [Patricia Campos:] Yes.

3

RP at 178-80.

On cross-examination, Patricia Campos testified:

[Defense counsel:] I think you indicated, Ms. Campos, that the thing you were worried about was the idea that Mr. Ruiz Roque was going to hunt you? That's what you testified to? Right?
[Patricia Campos:] What?
[Defense counsel:] You testified that you were concerned that Mr. Ruiz Roque was going to do what he had said he would do?
[Patricia Campos:] Yeah. He said he was going to do it and the way that he acted and things he said, I had no reason to not believe it.
[Defense counsel:] Okay. And that was what he said he was going to do was to hunt you? Right?
[Patricia Campos:] It was through text something in that sort, but that's what it meant.

RP at 186-87.

Patricia Campos first reported harassing text messages from Noe Ruiz Roque to law enforcement on July 1, 2017. On July 1, Officer Tim Weed of the Ellensburg Police Department took photos of the text messages on Campos' phone. Officer Weed estimated that he saw one hundred messages. Weed summoned Officer Andrew Hall, fluent in Spanish, to join Weed and Campos in reviewing the texts. Hall observed Campos as trembling and tearful.

During trial, the trial court admitted as an exhibit eighty pages of photographs taken by Officer Tim Weed on July 1 of text messages sent by Noe Ruiz Roque to Patricia Campos. The State projected photographs of the messages onto a screen, while Ellensburg Police Department Officer Andrew Hall, a certified interpreter, translated

4

from Spanish to English, for the jury, some of the photographed text messages.  Hall

testified concerning the texts sent on July 1:

> [The State]: Okay.  So, this one says 9:38 p.m.  What's concerning about that message and what is—what are the words in that message?
> HALL: What I'm going to do is translate the idea.
> [The State]. Okay.
> HALL: I'm not going to do anything about touching or anything. I'm just going to hunt deer and that's what I'm going to do and see.
> [The State]: Okay.  Why was that concerning to you?
> HALL: Why would he be talking about hunting deer?  And it seems to me based on the context of that and some of the other messages that were sent that he was using that as a reference to go after a—somebody that she knows.
> . . . .
> [The State]: Were there text messages about a rifle?
> HALL: There was.  There was a mention of a rifle.
> [The State]: Okay.  And was that concerning to you?
> HALL: Well, if somebody's making threats and referencing hunting deer and using a rifle, then that was a concern to me.
> [The State]: Okay.  Aside from the hunting references and the rifle references, anything else in those text messages that were concerning to you?
> HALL: That he was referencing not her, but somebody that she knows—that he was going to go after somebody that she knows.
> [The State]: Okay.
> HALL: And I don't know who that person was.

RP at 234-35.

Patricia Campos next reported harassing text messages from Noe Ruiz Roque to

law enforcement on July 3, 2017.  Ellensburg Police Department Officer Ryan Potter met

with Campos at 9:47 that night at a McDonald's restaurant.  Potter noticed that an upset

Campos had been crying.  During that night, Ruiz Roque texted Campos "hundreds" of

5

texts. Campos returned one text by directing Ruiz Roque to leave her alone.

Nevertheless, Ruiz Roque continued with many threatening text messages. Campos

again grew frightened. Officer Potter took photos of the text messages on Campos'

phone. According to Potter, Campos periodically and scaredly peered over her shoulder

even though she sat in a well-lit parking lot with a police officer by her side. Potter left

Campos' presence at 11:55 p.m. that night.

The trial court admitted as a separate exhibit photographs of text messages taken

by Officer Ryan Potter on July 3, and the State showed the photographs on a screen. This

exhibit showed approximately forty texts sent on July 3 between 11:00 p.m. and 11:55

p.m. Officer Andrew Hall again translated some of the July 3 texts from Spanish to

English:

> [The State]: Okay. How about the last one on there?
> HALL: "Good. The rifle is ready."
> [The State]: Okay. And then I think they pick up kind of here on the next—
> HALL: Okay.
> [The State]:—page. You see that "the rifle is ready," and then what?
> HALL: "Yeah, they're gonna go." And I can't read—11:07 is a little washed out. The first word—I'm not sure what it—oh, okay. "I'll come—I came by the house right now" or "I came by your house right now, okay."
> [The State]: And then this last little—
> HALL: And then watchita (sp)? And I'm not—I think that's a mixture of Spanish and English that would mean watch out for yourself.
> [The State]: Okay. How about—can you read—I'm going to hand these to you because they're hard to read on the—the next page after the watchita, there are additional text messages after that.
> HALL: Oh, okay. They are kind of dark.

[The State]: What—what is being texted after the watch out for yourself?

HALL: [Spanish]. "They don't sleep, perhaps they're not going to wake up."

[The State]: And anything else there?

HALL: "Don't get near the windows, okay." That's the next one.

[The State]: Okay.

HALL: And then the one after that—it's kind of washed out here. "If you—if you go out right now to bring it and you're going to see that what I do okay. That would be about 2, 3, or 4. You'll see." And then there's one last one here. "Okay, you played with me and now you're going pay." And then there's—I think this message might be cut off.

[The State]: The next—check the last page.

HALL: Yeah.

[The State]: [Inaudible]?

HALL: It's—it's continued here. "You played with me and now you're going to pay with me."

[The State]: Any messages after that?

HALL: Yeah, there's a whole page here.

[The State]: Okay. What does it say?

HALL: "Again you're going to see what happens okay" and then "right now that you get here mine is coming" whatever mine is.

[The State]: Okay.

HALL: And then there's four more blocks here. "Now when you—when you go, you're going to make it secret. I'm not going to tell you anything because you have something of mine that you'll pay for me—that you'll pay for" and then "you wanted to bring this game right now and you'll play it until I say. You're not going to know when he's outside, but be careful because until the shadows I'm going to haunt. Nothing messages now look tonight it's going to begin—the good thing is going to begin" I'd say. And that's the end of the page.

[The State]: Okay. Without having a lot of context for what's going on in these messages, do they appear to be threatening in nature?

HALL: Cryptically so. I mean, it—it depends on what he's talking about, but it seems like you could say yes.

RP at 237-40.

On July 4, 2017, Officer Ryan Potter contacted Patricia Campos at her residence.

Officer Potter learned that Campos received additional text messages and even phone calls from Noe Ruiz Roque after Potter left Campos' presence at 11:55 the night before. Law enforcement officers took no photographs of July 4 texts.

Ellensburg officers arrested Noe Ruiz Roque on the evening of July 4. The text messages ended only after Ruiz Roque's arrest.

PROCEDURE

The State of Washington charged Noe Ruiz Roque with one count of felony harassment occurring on July 3 and another count of felony harassment occurring on July 4. The State also charged Noe Ruiz Roque with one count of cyberstalking on July 3 and another count of cyberstalking on July 4. All four counts included a domestic violence allegation.

During trial, Noe Ruiz Roque testified in his own defense. He averred that Patricia Campos was not the intended recipient of his text messages. Instead, Ruiz Roque, at least on July 3, sent messages through Patricia Campos to Billy Martin. Ruiz Roque believed Martin to be Campos' boyfriend, and Ruiz Roque lacked Martin's telephone number. Ruiz Roque claimed he sent the texts to tell Martin: "[j]ust for him to leave me alone—that the rifle was ready." RP at 276. Ruiz Roque admitted that he sent text messages on July 3 and that Campos replied to his messages by asking him to leave her alone.

The trial court instructed the jury on count IV, July 4 cyberstalking, about two of

the alternative means of committing cyberstalking:

> To convict the defendant of the crime of cyberstalking, each of the following four elements must be proved beyond a reasonable doubt:
> (1) That on or about July 4, 2017, the defendant made an electronic communication to another person;
> (2) That at the time the defendant made the electronic communication the defendant intended to harass, intimidate, or torment any other person;
> (3) That the defendant:
> (a) made the electronic communication repeatedly whether or not a conversation occurred; or
> (b) threatened to inflict injury on the person called or to whom the electronic communication was made; and
> (4) That the electronic communication was made or received in the State of Washington. If you find from the evidence that elements (1), (2), and (4), and any of the alternative elements (3)(a) or (3)(b), have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (3)(a) or (3)(b) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt. On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these four elements, then it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 98.

The jury found Noe Ruiz Roque guilty of felony harassment for conduct on July 3, but reached no verdict on the alleged harassment based on his conduct on July 4. The jury found Ruiz Roque guilty of cyberstalking on both July 3 and July 4. As for all three guilty counts, the jury found that Ruiz Roque and Campos were members of the same family or household for purposes of the domestic violence allegation. The State

9

thereafter dismissed the second count of felony harassment in order to retry Ruiz Roque

on the July 4 charge.

At sentencing, the trial court assigned Noe Ruiz Roque an offender score of six for

his conviction on felony harassment. This offender score included one point for each of

the following prior felony convictions: a violation of the uniform controlled substances

act on July 3, 2014; three counts of second degree unlawful possession of a firearm on

June 28, 2016, with all three counts scored as a total of three points despite the earlier

sentencing court declaring that the three convictions encompassed the same criminal

conduct; and one point for each of the current cyberstalking convictions. Ruiz Roque did

not object to the inclusion of the earlier firearm convictions as three points or to the

present cyberstalking convictions in his offender score. The trial court sentenced Ruiz

Roque to twenty-seven months on the felony harassment conviction. The sentencing

court also sentenced Ruiz Roque to 364 days on the cyberstalking convictions, with the

364 days to run concurrently with the 27-month sentence for felony harassment.

At sentencing, the trial court entered a domestic violence no-contact order. The

no-contact order expires on September 8, 2027, ten years from the date of sentencing.

Noe Ruiz Roque did not object to the entry of the order.

The sentencing court imposed mandatory legal financial obligations on Noe Ruiz

Roque, including a $200 criminal filing fee and a $100 DNA collection fee. The trial

court entered an order of indigency that granted Ruiz Roque a right to appellate review at

public expense.

LAW AND ANALYSIS

*Issue 1: Does sufficient evidence support Noe Ruiz Roque's conviction for felony harassment on July 3?*

*Answer 1: Yes.*

Noe Ruiz Roque challenges the sufficiency of the evidence for two of his convictions: the conviction for felony harassment and the conviction for cyberstalking on July 4. We address the convictions in such order.

We recite familiar principles of law concerning sufficiency of the evidence. The standard of review for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980). When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. *State v. Salinas*, 119 Wn.2d at 201. Circumstantial evidence and direct evidence carry equal weight when reviewed by this court. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). Finally, an appellate court does not review credibility determinations made by the jury. *State v. Romero*, 113 Wn. App. 779, 798, 54 P.3d 1255 (2002).

Noe Ruiz Roque contends that insufficient evidence supported his conviction of felony harassment because the evidence presented at trial failed to show that he threatened to kill Patricia Campos and failed to establish that Campos experienced reasonable fear that he would execute his threat to kill. Therefore, no rational trier of fact could have found him guilty for felony harassment on July 3. We disagree.

RCW 9A.46.020 supplies the elements for the misdemeanor and felony levels of criminal harassment. The statute reads in relevant part with regard to felony harassment because of a threat to kill:

> (1) A person is guilty of harassment if:
> (a) Without lawful authority, the person knowingly threatens:
> (i) To cause bodily injury immediately or in the future to the person threatened or to any other person. . . .; and
>  (b) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out. "Words or conduct" includes, in addition to any other form of communication or conduct, the sending of an electronic communication.
> (2)(a) Except as provided in (b) of this subsection, a person who harasses another is guilty of a gross misdemeanor.
> (b) A person who harasses another is guilty of a class C felony if any of the following apply: . . . (ii) the person harasses another person under subsection (1)(a)(i) of this section by threatening to kill the person threatened or any other person. . . .

A person is guilty of felony harassment if the person knowingly threatens to kill someone, immediately or in the future, and the person by words or conduct places the person threatened in reasonable fear that the threat will be carried out. *State v. C.G.*, 150 Wn.2d 604, 609, 80 P.3d 594 (2003). The statute requires that the person threatened

12

subjectively feel fear and the fear must be reasonable. *State v. E.J.Y.*, 113 Wn. App. 940, 952-53, 55 P.3d 673 (2002).

A statute that makes a threat a crime may prohibit only "'true threats.'" *State v. Boyle*, 183 Wn. App. 1, 7, 335 P.3d 954 (2014). The Washington Supreme Court has adopted an objective test of what constitutes a "true threat." *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004). A "true threat" is "a statement made in a "context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life" of another person." *State v. Kilburn*, 151 Wn.2d at 43. A true threat constitutes a serious threat, not one said in jest, idle talk or political argument. *State v. J.M.*, 144 Wn.2d 472, 478, 28 P.3d 720 (2001). Whether a statement is a threat depends on all the facts and circumstances, and the trier of fact should not limit the inquiry to a literal translation of the words spoken. *State v. C.G.*, 150 Wn.2d at 611 (2003).

The circumstances of this appeal pose the question of whether a reasonable person could have foreseen that the text messages dispatched by Noe Ruiz Roque would be interpreted as a serious expression of an intent to kill Patricia Campos. Ruiz Roque argues that he did not directly or indirectly threaten to kill Campos on July 3 because Campos did not remember what Ruiz Roque wrote in the text messages other than "it was like hunting" and he sent that text message on July 1, not July 3. RP at 179. In so arguing, Ruiz Roque limits the universe of messages that he sent, including messages

13

dispatched on July 3.

Patricia Campos received alarming text messages from Noe Ruiz Roque on July 3, 2017. The texts include statements like "my rifle is ready." "I came by your house right now." "[W]atch out for yourself." "Don't get near the windows." "You played with me and now you're going to pay." "You're not going to know when he's outside, but be careful because until the shadows I'm going to haunt." "I'm not going to tell you anything because you have something of mine that you'll pay for." "You wanted to bring this game right now and you'll play it until I say." RP at 237-39.

A reasonable speaker in Noe Ruiz Roque's position would foresee that Ruiz Roque's statements would be interpreted by a listener as a serious expression of intention to kill, particularly in light of messages sent on July 1. Patricia Campos testified that Noe has guns. Campos further testified that she understood Ruiz Roque's texts to be threats to "hunt" her. The jury could reasonably infer that "hunting" means killing because of Campos' evident fear of Ruiz Roque's capabilities and her contacting law enforcement that evening and because of another reference to "rifles." Officers testified to the consuming fear experienced by Campos.

Noe Ruiz Roque further asserts that Patricia Campos was not placed in reasonable fear that he would perform his threat to kill. Under the law, the State must prove reasonable fear. RCW 9A.46.020(1)(b). Assuming the evidence establishes the victim's subjective fear, a rational trier of fact, viewing the evidence in the light most favorable to

14

the State, must still find beyond a reasonable doubt, using an objective standard, that the victim's fear was reasonable. *State v. Alvarez*, 74 Wn. App. 250, 260-61, 872 P.2d 1123 (1994), *aff'd*, 128 Wn.2d 1, 904 P.2d 754 (1995).

Noe Ruiz Roque cites *State v. C.G.*, 150 Wn.2d at 610 (2003). In *C.G.*, the State charged a juvenile with felony harassment after she made the following threat to her school's vice-principal: "I'll kill you Mr. Haney, I'll kill you." *State v. C.G.*, 150 Wn.2d at 606-07. At the adjudicatory hearing, Tim Haney testified that C.G.'s threat caused him concern, but did not employ a word stronger in emotion than "concern." Our supreme court reversed the juvenile's conviction while finding that no evidence placed Haney in reasonable fear that she would in fact kill him.

We see major distinctions between the circumstances faced by Patricia Campos and the vice-principal in *C.G.* Campos' and Ruiz Roque's intimate relationship lacks comparison to a student/principal relationship. At the end of the dating relationship, Campos endured Ruiz Roque's angry fits when he banged on her windows, drove wildly through her neighborhood, knocked on her door, and stood by her window to listen. This erratic behavior caused her to lock her house at certain hours because she knew he would appear. Contrary to the vice-principal in *C.G.*, Campos testified that Ruiz Roque's threatening text caused her fear because she believed his texts. Campos reached out to the police due to her fear. The police confirmed the consuming fright experienced by Campos when receiving the messages. A reasonable person, under these circumstances,

15

would consider references to hunting her with a rifle a threat to kill. A reasonable person, confronted with a former lover threatening to get what he is due, would also worry of death.

> *Issue 2: Does sufficient evidence support Noe Ruiz Roque's conviction for cyberstalking on July 4?*

> *Answer 2: Yes.*

Noe Ruiz Roque claims no evidence supported a conviction for the second count of cyberstalking. The cyberstalking statute, RCW 9.61.260, declares:

> (1) A person is guilty of cyberstalking if he or she, with intent to harass, intimidate, torment, or embarrass any other person, and under circumstances not constituting telephone harassment, makes an electronic communication to such other person or a third party:
> (a) Using any lewd, lascivious, indecent, or obscene words, images, or language, or suggesting the commission of any lewd or lascivious act;
> (b) Anonymously or repeatedly whether or not conversation occurs; or
> (c) Threatening to inflict injury on the person or property of the person called or any member of his or her family or household.

The State relied on subsections (b) and (c) when prosecuting Noe Ruiz Roque.

Noe Ruiz Roque contends the State presented no evidence of a text on July 4, 2017. He underscores that the exhibits admitted at trial containing the text messages sent from Ruiz Roque to Patricia Campos contain no text messages from July 4. We agree that none of the exhibits confirm a text sent on July 4. Nevertheless, testimony of Patricia Campos and other witnesses permitted the jury to draw reasonable inferences that

16

Ruiz Roque repeatedly sent messages on July 4 in violation of subsection (b) of RCW 9.61.260.

One exhibit confirmed that Noe Ruiz Roque sent approximately forty text messages from his phone to Patricia Campos between 11:00 p.m. and 11:55 p.m. on July 3, 2017. Campos testified that the texts and phone calls only stopped when police arrested Ruiz Roque during the evening of July 4. Therefore, the texting must have continued throughout July 4. Officer Ryan Potter confirmed that Campos received many text messages and some phone calls from Ruiz Roque after 11:55 p.m. on July 3. July 4 arrived only five minutes later. Other evidence suggests that Ruiz Roque would not cease his incessant communications until stopped by law enforcement.

*Issue 3: Whether Noe Ruiz Roque was denied his right to a unanimous jury verdict for cyberstalking on July 4 because evidence did not support one of the alternative means of committing the crime?*

*Answer 3: Yes.*

Noe Ruiz Roque argues that the trial court instructed the jury on alternative means of committing cyberstalking without including a unanimity instruction. Ruiz Roque further maintains that, because the State presented insufficient evidence to prove one of the alternative means for his conduct on July 4, the trial process breached his constitutional right to a unanimous verdict. We agree.

17

The alternative means determination relates to the constitutionally protected right

of jury unanimity required under article I, section 21 of the Washington Constitution.

*State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). An alternative means crime

results from multiple means of proving the charge. *State v. Owens*, 180 Wn.2d at 96.

When the State may present compound means of proving the crime, the trial court must

instruct the jury that it must be unanimous as to the particular means on which it convicts,

unless sufficient evidence supports each of the alternative means. *State v. Owens*, 180

Wn.2d at 95.

The legislature has not defined what constitutes an alternative means crime or

designated which crimes comprise alternative means crimes. *State v. Owens*, 180 Wn.2d

at 96. Therefore, the courts must determine whether a crime constitutes an alternative

means crime by reviewing each statute on its own merits. *State v. Owens*, 180 Wn.2d at

96. We must review the nature of the language employed with regard to differing

methods to commit the crime.

In one sense, any statute that lists more than one action when defining the crime

creates an alternative means crime. Nevertheless, the law does not deem any such statute

to construct an alternative means crime if the actions, be they described by verbs, nouns,

or prepositional phrases, vary inconsequentially in meaning. Alternative means should

be probed based on how varied the actions are that could constitute the crime. *State v.*

*Owens*, 180 Wn.2d at 97. The more varied the criminal conduct, the more likely the

18

statute describes alternative means. *State v. Sandholm*, 184 Wn.2d 726, 734, 364 P.3d 87 (2015). But when the statute describes minor nuances inhering in the same act, the more likely the various "'alternatives'" are merely facets of the same criminal conduct. *State v. Sandholm*, 184 Wn.2d at 734. If no single action expressed in the statute can be completed without simultaneously completing at least one other action, the various acts are too similar to constitute distinct alternative means. *State v. Butler*, 194 Wn. App. 525, 530, 374 P.3d 1232 (2016).

Use of the disjunctive "or" in a list of methods for committing the crime does not necessarily create alternative means of committing the crime. *State v. Peterson*, 168 Wn.2d 763, 770, 230 P.3d 588 (2010). An alternative means analysis places less weight on the use of the disjunctive "or" and more weight on the distinctiveness of the verbs or nouns that form the criminal conduct. A statute divided into subparts is more likely to designate alternative means. *State v. Butler*, 194 Wn. App. at 528; *State v. Lindsey*, 177 Wn. App. 233, 241, 311 P.3d 61 (2013).

Determining whether a crime is an alternative means crime is not an end in itself but determines what proof the State must present. In alternative means cases, when substantial evidence supports all alternative means submitted to the jury, unanimity as to the means is not required. *State v. Armstrong*, 188 Wn.2d 333, 340, 394 P.3d 373 (2017); *State v. Woodlyn*, 188 Wn.2d 157, 164, 392 P.3d 1062 (2017). Conversely, if insufficient evidence supports any of the means, the constitution demands a particularized expression

of juror unanimity. *State v. Woodlyn*, 188 Wn.2d at 165. When insufficient evidence supports one of the alternative means charged and the jury does not specify that it unanimously agreed on the other alternative, we face the danger that the jury rested its verdict on an invalid ground. *State v. Armstrong*, 188 Wn.2d at 343-44.

I note two anomalies regarding the alternative means crime rule of sufficient or substantial evidence. First, the constitution demands that one be convicted of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 362, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). One might conclude then that, on review before an appellate court, the State must provide overwhelming evidence or proof beyond a reasonable doubt of guilt for each alternative means so that we do not face a compromise of jury unanimity. No decision forwards such a proposition. Second, one might reason that, if the State provides overwhelming evidence of guilt on one of the alternative means, harmless error saves the verdict from reversal. After all, a unanimous jury could convict the accused of the crime if the evidence supports only one alternative means beyond a reasonable doubt. No decision supports this proposition.

The State charged Noe Ruiz Roque with cyberstalking (DV) contrary to RCW 9.61.260, which provides:

> (1) A person is guilty of cyberstalking if he or she, with intent to harass, intimidate, torment, or embarrass any other person, . . . makes an electronic communication to such other person or a third party:
> (a) Using any lewd, lascivious, indecent, or obscene words, images, or language, or suggesting the commission of any lewd or lascivious act;

(b) Anonymously or repeatedly whether or not conversation occurs; or

(c) Threatening to inflict injury on the person or property of the person called or any member of his or her family or household.

No published decisions in Washington address whether cyberstalking is an alternative means crime.

After dissecting the language of the cyberstalking statute, we agree with Noe Ruiz Roque that the crime of cyberstalking is an alternative means crime. Subsection (1) of the statute lists, in further subsections, three methods by which one may violate the statute. The disjunctive "or" separates the three means. Each of the three sub-subsections describes distinct acts that amount to cyberstalking. For example, a person can send an electronic communication with intent to intimidate or torment that threatens to inflict injury but without using lewd, lascivious, indecent, or obscene words. One could intend to harass and dispatch repetitive electronic communications without intending to embarrass by sending lewd communications. We reserve for a later day whether the statute contains more than three distinct means that might separate the various intents or distinguish between anonymous and repetition communications.

The trial court instructed the jury to convict Noe Ruiz Roque on count IV, cyberstalking on July 4, if he (a) made the electronic communication repeatedly whether or not a conversation occurred or (b) he threatened to inflict injury on the person to whom he sent the electronic communication. The court further instructed the jury that, in order

to return a guilty verdict, the jury need not be unanimous as to which of the alternatives the State proved beyond a reasonable doubt as long as each juror found that at least one alternative had been proved beyond a reasonable doubt. We must therefore determine if sufficient evidence existed to support each alternative. We already determined that sufficient evidence supported a conviction for repetitious communications. We focus on whether the texts threatened injury or death.

Noe Ruiz Roque asserts that insufficient evidence supported the alternative means element that he threatened to inflict injury on Patricia Campos by any texts on July 4. We agree. The evidence supported a finding that Ruiz Roque continued to send texts on July 4. But the State presented no evidence as to the content of those text messages. Patricia Campos and Officer Ryan Potter never testified to the nature of the July 4 texts. Although some texts sent on July 3, as shown by the photographs of the texts, contained threats of bodily injury, some also embedded no threats. Therefore, the texts sent on July 4 could have as easily contained no threats.

*Issue 4: Whether the sentencing court committed error when counting each of the three 2016 convictions for possession of a firearm as one point for the offender score, for a total of three points, when the earlier sentencing court declared the three convictions to entail the same criminal misconduct?*

*Answer 4: Yes.*

Noe Ruiz Roque asserts that the trial court erred by not counting his three prior convictions of second degree unlawful possession of a firearm as one offense for purposes of his offender score. The State concedes this miscalculation of the offender score. We accept the concession.

We otherwise remand Noe Ruiz Roque's prosecution to the trial court to vacate the conviction for cyberstalking on July 4. The State may retry this count. Whether or not the State retries the count, the trial court will need to conduct another resentencing during which the three 2016 convictions for unlawful possession of a firearm should be rescored as one total point.

*Issue 5: Whether this court should review Noe Ruiz Roque's assignment of error that the sentencing court committed error when the court counted Ruiz Roque's current gross misdemeanor conviction for cyberstalking-domestic violence as one point in his offender score, when Ruiz Roque failed to argue before the sentencing court that the conviction could not be included in the offender score calculation?*

*Answer 5: Yes.*

Noe Ruiz Roque next contends that the sentencing court miscalculated his offender score by counting his current gross misdemeanor cyberstalking convictions in his offender score because the convictions do not qualify as "repetitive domestic violence offenses." In response, the State argues that Ruiz Roque waived this argument by failing to assert it at sentencing. We note that we vacated the July 4 cyberstalking conviction

such that Ruiz Roque's assignment of error extends for the time being only to one conviction.

The Washington Supreme Court has declared that, in the context of sentencing, erroneous or illegal sentences may be challenged for the first time on appeal. *In re Personal Restraint of Call*, 144 Wn.2d 315, 331, 28 P.3d 709 (2001). In turn, in general, a defendant cannot waive a challenge to a miscalculated offender score, and waiver does not apply when the alleged sentencing error is a legal error leading to an excessive sentence. *In re Personal Restraint of Goodwin*, 146 Wn.2d 861, 874, 50 P.3d 618 (2002). But, waiver may be found when the alleged error involves an agreement to facts, later disputed, or when the alleged error involves a matter of trial court discretion. *In re Personal Restraint of Goodwin*, 146 Wn.2d at 874.

An offender may challenge erroneous sentences lacking statutory authority for the first time on appeal. *In re Personal Restraint of Goodwin*, 146 Wn.2d at 877. A sentencing court acts without statutory authority when it imposes a sentence based on a miscalculated offender score. *In re Personal Restraint of Johnson*, 131 Wn.2d 558, 568, 933 P.2d 1019 (1997).

Noe Ruiz Roque asserts that his assignment of error with regard to assessing one point for each cyberstalking conviction does not involve a factual dispute nor an issue of trial court discretion. Ruiz Roque contends the assignment poses a purely legal issue involving statutory interpretation: whether gross misdemeanor cyberstalking (DV) is a

24

"repetitive domestic violence offense" under RCW 9.94A.030(42). The State concedes

that the question is one of statutory interpretation. Therefore, we agree with Ruiz Roque

that he may assert this claimed error for the first time on appeal.

*Issue 6: Whether the court committed error when the court counted Ruiz Roque's*

*current gross misdemeanor conviction for cyberstalking domestic violence as one point*

*in his offender score?*

*Answer 6: Yes.*

We move to the merits of Noe Ruiz Roque's challenge to his offender score based

on the scoring of the cyberstalking convictions. RCW 9.94A.525 is a comprehensive

statute addressing criminal offender scores, which, in turn, determines the length of

criminal sentences. Under RCW 9.94A.589(1):

> [W]henever a person is to be sentenced for two or more current
> offenses, the sentence range for each current offense shall be determined by
> using all other current and prior convictions as if they were prior
> convictions for the purpose of the offender score.

The level of seriousness of the pending conviction and the defendant's offender score

determine the standard sentence range under Washington's Sentencing Reform Act of

1981, chapter 9.94A RCW. The court calculates the offender score by counting the prior

and current felony convictions in accordance with the rules for each offense. RCW

9.94A.525. The offender score is the sum of points accrued under RCW 9.94A.525

rounded down to the nearest whole number.

25

To determine the proper offender score for Noe Ruiz Roque we must navigate a morass of sections in Washington's Sentencing Reform Act. Generally, when sentencing involves a nonviolent offense, the sentencing court should not include gross misdemeanor convictions, such as Ruiz Roque's convictions for cyberstalking, in the offender score. RCW 9.94A.525(7). RCW 9.94A.030(34) defines "nonviolent offense" as "an offense which is not a violent offense." In turn, RCW 9.94A.030(55) lists fourteen categories of crimes that constitute a "violent offense." The statutory subsection does not list cyberstalking. Nevertheless, another statutory provision addresses domestic violence offenses being counted in the score. The jury found that Noe Ruiz Roque's cyberstalking convictions entailed domestic violence crimes. RCW 9.94A.525 declares:

> (21) If the present conviction is for a felony domestic violence offense where domestic violence as defined in RCW 9.94A.030 was pleaded and proven, count priors as in subsections (7) through (20) of this section; however, count points as follows:
> . . . .
> (d) Count one point for each adult prior conviction for a repetitive domestic violence offense as defined in RCW 9.94A.030, where domestic violence as defined in RCW 9.94A.030, was pleaded and proven after August 1, 2011.

In turn, RCW 9.94A.030(42) defines "repetitive domestic violence offense" as:

> (v) Domestic violence stalking offense under RCW 9A.46.110 that is not a felony offense. . . .

Noe Ruiz Roque's gross misdemeanor cyberstalking convictions are considered prior convictions for the purposes of calculating his offender score. Therefore, this court

must ask whether cyberstalking is a "repetitive" domestic violence offense. The sentencing reform act does not define "cyberstalking." RCW 9.94A.030. Furthermore, the definition of "[r]epetitive domestic violence offense" does not include cyberstalking. RCW 9.94A.030(42). Consequently, Noe Ruiz Roque asserts that his gross misdemeanor cyberstalking convictions are not repetitive offenses.

In response, the State argues that legislative history and case law on the statute do not support Noe Ruiz Roque's contention. Yet, the State fails to cite to any authority when critiquing Ruiz Roque's argument. In reading the language of the statutes, we conclude that Noe Ruiz Roque did not engage in repetitive offenses. We remand for resentencing on this error also.

*Issue 7: Whether Noe Ruiz Roque's trial counsel engaged in ineffective assistance of counsel when failing to object to the imposition of a domestic violence no-contact order ten years in length?*

*Answer 7: We decline to address this contention, since we may grant Noe Ruiz Roque's requested relief on other grounds.*

Generally, a court imposed prohibition, such as a no-contact order, may not exceed the statutory maximum sentence for the crime of conviction. *State v. Armendariz*, 160 Wn.2d 106, 120, 156 P.3d 201 (2007). Noe Ruiz Roque asserts that his Sixth Amendment right to effective assistance of counsel was denied when defense counsel failed to object to the imposition of a ten-year domestic violence no-contact order when

27

the maximum sentence for a class C felony such as felony harassment is five years.

RCW 9A.20.021(1)(c).

RCW 9.94A.505(9) provides that a court may impose and enforce crime-related prohibitions as part of any sentence. A "[c]rime-related prohibition" includes a court order "prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). A no-contact order is a crime-related prohibition. *In re Personal Restraint of Rainey*, 168 Wn.2d 367, 376, 229 P.3d 686 (2010). The statutory maximum for Noe Ruiz Roque's underlying felony harassment offense, a class C felony, is five years. RCW 9A.20.021(1)(c). Thus, the maximum length of a no-contact order imposed is five years.

We need not address Ruiz Roque's ineffective assistance claim. We may remand for the shortening of the no-contact order to five years on other grounds. An error at sentencing may be challenged for the first time on appeal. *In re Personal Restraint of Call*, 144 Wn.2d at 331 (2001). A trial court may only impose a sentence that is expressly authorized by statute. *In re Postsentence Review of Leach*, 161 Wn.2d 180, 184, 163 P.3d 782 (2007). The State concedes that the sentencing court should shorten the years of the no-contact order.

*Issue 8: Whether we should direct the vacation of the sentencing court's imposition of a criminal filing fee and DNA collection fee as part of Noe Ruiz Roque's legal financial obligations?*

28

*Answer 8: Yes.*

By motion filed after the filing of appellate briefs, Noe Ruiz Roque asks this court to reverse the trial court's imposition of a $200 criminal filing fee and a $100 DNA collection fee. Ruiz Roque's argument references the recent amendments to many of the legal financial obligation statutes by House Bill 1783 and a recent decision by our Supreme Court. House Bill 1783 became effective on June 7, 2018, nearly two months after Ruiz Roque filed his opening brief. In addition, our Supreme Court decided *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018) on September 20, 2018. Consequently, Ruiz Roque was unable to raise this issue in his opening brief due to the timing of House Bill 1783 and *Ramirez*.

House Bill 1783 amends several statutory provisions related to the imposition of legal financial obligations. Among its amendments, House Bill 1783 changes former RCW 10.01.160(3) to prohibit the imposition of any discretionary costs on indigent defendants. *State v. Ramirez*, 191 Wn.2d at 748. Additionally, House Bill 1783 amends former RCW 36.18.020(2)(h) to prohibit the imposition of a $200 criminal filing fee on indigent defendants. *State v. Ramirez*, 191 Wn.2d at 748. Lastly, House Bill 1783 amends former RCW 43.43.7541 to make the DNA database fee no longer mandatory if a defendant's DNA has been previously collected as a result of a prior conviction. *State v. Ramirez*, 191 Wn.2d at 747.

The Washington Supreme Court, in *State v. Ramirez*, 191 Wn.2d 732 (2018), held

that the statutory amendments in House Bill 1783 apply prospectively to cases on direct

appeal at the time the legislature enacted the amendment. In *Ramirez*, David Ramirez's

case was still pending review, and not final, when the legislature enacted the

amendments. Therefore, our Supreme Court held that Ramirez was entitled to the benefits

of the amendments.

Noe Ruiz Roque's case was still pending on direct review when the Washington

State Legislature adopted House Bill 1783. Therefore, he is entitled to the benefits of the

statutory changes. Ruiz Roque was indigent for purposes of appeal and would likely be

found indigent based on the information provided in his reports as to continued

indigency. Thus, on remand, the sentencing court should strike the $200 criminal filing

fee. Because correction officials previously collected Ruiz Roque's DNA, the court

should also vacate the $100 DNA collection fee.

## CONCLUSION

We remand Noe Ruiz Roque's prosecution for further proceedings. The trial court

should vacate without prejudice the conviction of cyberstalking occurring on July 4,

2017. Whether or not the State retries the second cyberstalking charge, the trial court

should conduct resentencing. On resentencing, the trial court should count all 2016

convictions for unlawful possession of a firearm as one point on the offender score. The

trial court should not count Ruiz Roque's current cyberstalking conviction as a point in

the score. The resentencing court should also strike the legal financial obligations of a criminal filing fee and a DNA collection fee.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, J.

_____
Pennell, A.C.J.