IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  38844-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATHAN O. BEAL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Nathan Beal was convicted of murdering his ex-wife, Mary Schaffer. On appeal, he argues that one of the State's witnesses impermissibly commented on his right to remain silent during trial and that this constitutional error is not harmless beyond a reasonable doubt.  Beal also appeals the imposition of the $200 criminal filing fee and the lifetime no-contact orders prohibiting any contact with his children.  In his statement of additional grounds (SAG), Beal raises several other issues.

We hold that the detective's remark was a comment on Beal's right to remain silent.  However, the State has met its burden to show that the error was harmless beyond a reasonable doubt.  Accordingly, we affirm Beal's conviction.  However, we remand for the court to reconsider the lifetime no-contact orders, keeping in mind Beal's constitutional rights as a parent, the children's wishes, and the need to protect the children from harm.  We deny or decline to address the remaining issues.

BACKGROUND

1.    ALLEGATIONS

Beal and Schaffer were married and had two children together, H.B. and N.B. Schaffer and Beal separated in 2015 and officially divorced in 2019. After the divorce, Schaffer moved to Oregon with H.B. and N.B. Schaffer began dating Justin Sharp in 2015.

In August 2019, Schaffer and Sharp travelled to Spokane to pick up the children who had been staying with Beal. Beal asked Schaffer to meet him in a park without the children present before the custody exchange. Beal told Schaffer and Sharp "there would be no exchange of the children unless he was able to have a one-on-one conversation alone with Ms. Schaffer." Rep. of Proc. (RP) at 330. Sharp joined Schaffer for the conversation because she was afraid, which angered Beal.

Following the meeting, Schaffer and Sharp drove to Beal's apartment, but Beal refused to exchange custody of the children. After the police were called, Beal released the children to Schaffer.

Two months after this incident, Beal purchased a handgun and convinced his then girlfriend to register it in her name.

The following year, on August 8, 2020, Schaffer was murdered in Spokane. On that day, Schaffer had again travelled to Spokane to retrieve H.B. and N.B., who had

2

been staying with Beal for approximately five weeks. Schaffer flew to Spokane, rented a car, and planned to drive H.B. and N.B. back to Oregon.

Schaffer was concerned for her safety. Sharp, who could not travel with Schaffer to Spokane, agreed to keep in constant contact with her. Schaffer sent her last text to Sharp at 11:44 a.m. It said: "I'm parked over here across from [Beal]'s place at the grocery store . . . there's so many sketchy looking people i'm afraid to leave the car!" Ex. 116.

A receipt found in Schaffer's car indicated that she purchased snacks from Rosauers, a supermarket near Sharp's apartment at noon.

At 12:14 p.m., Schaffer texted H.B. and Beal indicating that she was twenty minutes away from Beal's apartment. At 12:36 p.m., Schaffer texted H.B. to let her know that she had arrived. H.B. responded that Beal was not in the apartment but had gone to the store.

H.B. later testified that Beal had left the apartment before Schaffer arrived to get mochas for himself, H.B., and N.B. The coffee shop was located a block away from Beal's apartment complex. H.B. testified that when Beal had purchased mochas in the past, the trip usually took between 20 and 30 minutes and H.B. and N.B. usually went with him. H.B. testified that on the day of Schaffer's murder, the trip to get mochas took Beal 40 minutes to an hour. Beal's receipt from the coffee shop was timestamped 12:30

3

p.m. Surveillance footage captured Beal walking on the street outside of his apartment complex beginning at 12:37:42 p.m.

Sharp continued texting Schaffer. When she did not respond, he tried to contact H.B. H.B. responded to Sharp's texts but Beal would not allow H.B. to answer his calls. Sharp called the police to request a welfare check on Schaffer and provided them with a picture of Schaffer's rental car.

At 2:40 p.m., officers found Schaffer dead in her rental car from a gunshot wound to her head. Schaffer's vehicle was parked 20 yards from Beal's apartment complex and was visible from Beal's apartment. The driver's side door was ajar and Schaffer was positioned in such a way that it appeared she was getting ready to step out of the vehicle when she was shot. A single Winchester 9-mm Luger shell casing was found outside of the vehicle.

When Schaffer was found, it appeared that she had been dead for several hours. She was holding her purse, which still contained her wallet and all of her credit cards. Her luggage was also found undisturbed in the backseat.

Officers executed a search warrant on Beal's apartment where they found a backpack containing a loaded Ruger EC9s with a magazine inserted and a round in the chamber, as well as additional Winchester 9-mm Luger bullets. H.B. testified that she was aware Beal had a gun because she had seen it in a backpack in Beal's closet.

Beal was arrested and charged with first degree murder.

2.    TRIAL

Prior to trial, Beal was interviewed by the police. The State requested a CrR 3.5 hearing to determine the admissibility of some of Beal's statements to the police. The court found that Beal waived his constitutional right to remain silent and began answering questions. However, Beal stated at one point during the interview that, "I'm not answering any more questions," at which time Detective Wayne Downing, who was interviewing Beal, terminated the interview. The court ruled that Beal's statements, up until he expressly stated he did not want to answer more questions, were admissible.

At trial, multiple police witnesses testified for the State. Detective Downing testified regarding statements Beal made during a police interview:

[Detective Downing:] May I refer to my report?

[The State:] Yes.

[Detective Downing:] (Looking at a document.) He told me he doesn't own a firearm but he knows—he knows how to use them.

[The State:] Okay. Did you ask the defendant if there was a firearm in his apartment, in his—in his house?

[Detective Downing:] Yes, I did.

[The State:] And what was his initial response to that?

[Detective Downing:] He shrugged his shoulders and didn't answer.

[The State:] Okay. And did you ask him a clarifying question, "Is there a firearm in your apartment?"

[Detective Downing:] Yes, I did.

5

[The State:] And what was his response to that?

[Detective Downing:] He said, "I don't want to answer that."

[The State:] Okay. Did he—what was his demeanor like when he initially responded to that?

[Detective Downing:] He was calm.

[The State:] Okay. Did he ever smile?

[Detective Downing:] He smiled off and on throughout the interview –

[The State:] Okay.

[Detective Downing:] —yes.

[The State:] At some point in this interview with the defendant, did you ask him, "Is the gun still in your backpack?"

[Detective Downing:] Yes, I did.

[The State:] What was his reaction and what was his response to that question?

[Detective Downing:] His reaction was his body language totally changed. He slumped down in his chair, looked down at the ground, and his lower lip began to quiver.

[The State:] And what was his response?

[Detective Downing:] His response is done—is he's done talking.

RP at 452-53.

Following Downing's testimony, Beal moved for a mistrial alleging that the

Detective had impermissibly commented on Beal's right to remain silent. The State

responded that it had instructed Detective Downing on what he could and could not say

6

pursuant to the CrR 3.5 ruling but during the testimony the Detective got lost in his report and mistakenly testified about Beal's request to end questioning.

The court indicated that Beal's statements were admissible up to the point that he stated he did not want to answer further questions. The court concluded that Detective Downing's reference was an indirect comment on Beal's silence but that no prejudice had ensued because the State did not ask the jury to infer guilt from Beal's invocation of his right to remain silent. Thus, the court denied the motion for a mistrial.

Through his attorney, Beal indicated he did not want a limiting instruction that would draw the jury's attention to the remark. Instead, at Beal's suggestion, the State recalled Detective Downing to the stand to correct his response to the question.

Upon being recalled to testify, Detective Downing read directly from the interview transcript:

[The State:] Did you ask the defendant if he owned a firearm?

[Detective Downing:] Yes, I did.

[The State:] And what was his answer?

[Detective Downing:] "No, I don't."

[The State:] And did you ask him a second time if he owned a firearm?

[Detective Downing:] Yes, I did.

[The State:] And what was his answer?

[Detective Downing:] "I do not own a firearm."

[The State:] And did you ask the defendant, "Is there a firearm in your house or apartment?"

[Detective Downing:] Yes, I did.

[The State:] And what was his answer?

[Detective Downing:] "Next question, please."

[The State:] And did you ask the defendant if the gun was still in his backpack?

[Detective Downing:] Yes.

[The State:] And what was his answer?

[Detective Downing:] He asked, "What?"

[The State:] Okay. Did you re-ask, "Is the gun still in your backpack?"

[Detective Downing:] Yes, I did.

[The State:] What was his answer?

[Detective Downing:] "I don't understand."

[The State:] And again, did you re-ask him again, "Is the gun still in your backpack?"

[Detective Downing:] Yes, I did.

[The State:] And what was his answer.

[Detective Downing:] "I don't know why you're asking me that."

RP at 700-01.

The State called twenty-one witnesses in total. Officer Michael Baugh testified that Schaffer's murder did not appear to be a robbery and that there were no signs of a

8

struggle. He testified that nothing was taken from Schaffer's vehicle, including her purse and luggage.

The State called Sandra Young, whose boyfriend lived next door to Beal. She testified that on the day of Schaffer's murder, she arrived at her boyfriend's apartment around 12:30 p.m. While she was getting items out of her car, she heard a gunshot. Young stated that she looked toward the street and saw Beal directly behind Schaffer's rental car. On cross-examination, the defense pointed out that Young had spoken to several officers on the day of Schaffer's murder and neglected to mention Beal's presence. Young testified that she did not mention Beal's presence to the police at first because it was not unusual for her to see him in the neighborhood and it "didn't occur to [her]" to mention it. RP at 360.

Michael Williamson testified that he lived in the same area as Beal. Williamson testified that on the date of Schaffer's murder he walked to a nearby grocery store and noticed Schaffer's vehicle parked on the street with the door ajar. On the return trip, he again walked past Schaffer's vehicle and noticed the door still ajar. He instructed people nearby to call the police and upon looking in the windshield, saw blood running down Schaffer's face.

Emily Goodwin testified that she dated Beal in 2020. Goodwin testified that Beal did not like Schaffer and recalled him saying that H.B. and N.B. "were going to be coming to see him for the summer and that they would not be going back." RP at 540.

9

Christina Brewer, another ex-girlfriend of Beal, testified that she purchased Beal's Ruger EC9s at his direction. She stated she purchased the gun using money given to her by Beal and registered it under her name at his request. Brewer testified one of the reasons Beal wanted the gun was because of the custody battle.

Joseph Schaffer, Schaffer's older brother, testified that Beal had called him in the past and stated that "[Schaffer] needed to be taken out." RP at 660.

H.B., Beal and Schaffer's fourteen-year-old daughter, testified regarding Beal's actions on the day of Schaffer's murder. H.B. testified that Beal was "energetic but anxious" when he returned to the apartment on the day of Schaffer's murder with the mochas. RP at 654. She stated that Beal was "more alert than usual, checking his surroundings often" and kept checking the "curtains and the door." *Id*. Additionally, H.B. testified that Beal was "upset or disappointed" with the custody arrangement between him and Schaffer. RP at 647. She also testified about her contact with Schaffer and Sharp on the day of Schaffer's murder.

Sharp testified about his contact with Schaffer, the police, and H.B. on the day of Schaffer's murder. He also recounted Beal's anger and actions toward Schaffer during the 2019 custody exchange.

Jeremy Phillips and Brittany Wright, forensic scientists, testified that Beal's fingerprints and DNA[1] were found on the grip, trigger, textured area, and barrel of his Ruger EC9s. Further, Brett Bromberg-Martin, a forensic scientist, testified that a microscopic examination revealed that the bullet used to kill Schaffer matched bullets test-fired from Beal's Ruger EC9s.

Beal was the only witness that testified for the defense. He maintained that he did not shoot Schaffer.

The jury found Beal guilty of first degree murder.

3.     SENTENCING

The court sentenced Beal to 380 months of confinement. At sentencing, the State asked the court to impose the $500 victim assessment, a $200 criminal filing fee, a $100 DNA collection fee, and restitution in the amount of $4,377.42. There was no discussion regarding Beal's finances or indigency status. Beal objected to the imposition of restitution:

> [BEAL'S ATTORNEY:] In addition, your Honor, we don't have objections to most—to the 36 months of community custody, the LFOs.[2] Mr. Beal is objecting to the victim compensation restitution. So I've just noted that on the order for restitution.

RP at 860. The court imposed all of the fees requested by the State including restitution.

---

[1] Deoxyribonucleic acid.
[2] Legal financial obligations.

The State also requested a lifetime no contact order between Beal and Schaffer's family, including H.B. and N.B.  Beal objected to the imposition of a lifetime no contact order between him and H.B. and N.B.  H.B. stated through her attorney that she did not wish to have contact with Beal, but there was no information regarding whether N.B., Beal's eleven-year-old son, wanted to have contact with Beal.  The court requested that counsel follow up with N.B. about his wishes regarding contact.  The court imposed a lifetime no contact order with Schaffer's family, including Beal's children.  The court stated it would reconsider the no contact order upon receiving more information regarding N.B.'s wishes.

Beal timely appealed.

ANALYSIS

1.      COMMENT ON BEAL'S SILENCE

Beal's primary argument on appeal is that Detective Downing violated Beal's constitutional right to remain silent by testifying that Beal ended the interrogation, and this constitutional error was not harmless beyond a reasonable doubt.  The State maintains that the remark was not a direct comment on Beal's right but alternatively argues that even if it was constitutional error, the State has demonstrated that the error was harmless beyond a reasonable doubt.  We hold that there was error but that the error was harmless.

12

A defendant's right to silence is derived from the Fifth Amendment to the United States Constitution applicable to the State through the Fourteenth Amendment and article I, section 9 of the Washington Constitution. State v. *Romero*, 113 Wn. App. 779, 786, 54 P.3d 1255 (2002). In the context of post-arrest silence, when the State provides *Miranda*[3] warnings that implicitly promise that a defendant's silence will not be used as evidence, the defendant's invocation of this right is protected by due process under the Fourteenth Amendment. *State v. Burke*, 163 Wn.2d 204, 217, 181 P.3d 1 (2008); *see also Romero*, 113 Wn. App. at 786-87 (citing *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); *State v. Fricks*, 91 Wn.2d 391, 395-96, 588 P.2d 1328 (1979)). Pursuant to this protection, a prosecutor may not use a defendant's exercise of his constitutional right to silence as substantive evidence of guilt, and "[a] police witness may not comment on the silence of the defendant so as to infer guilt from a refusal to answer questions." *State v. Lewis*, 130 Wn.2d 700, 705, 927 P.2d 235 (1996).

In considering whether a remark rises to the level of a constitutional error, our Supreme Court has distinguished between a "comment" and a "reference" to a defendant's silence. *Burke*, 163 Wn.2d at 225 (Madsen, J., dissenting). The primary distinction between a reference and a comment is the intended purpose of the remark. *Id.* at 216. A comment on a defendant's silence occurs when the State uses the silence to show or imply guilt. *Lewis*, 130 Wn.2d at 707. On the other hand, a reference to silence,

---

[3] *Miranda v Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

is not considered a comment on the "constitutional right to remain silent if 'standing

alone, [it] was so subtle and so brief that [it] did not naturally and necessarily emphasize

defendant's testimonial silence.'" *Burke*, 163 Wn.2d at 216 (second alteration in original)

(internal quotation marks omitted) (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804

P.2d 10 (1991)). Some courts have characterized the distinction between a comment and

a reference to the right to remain silent as a direct or an indirect comment on silence.

*See, e.g.*, *Romero*, 113 Wn. App. at 787.

Whether a remark is considered a comment or a reference will dictate the standard

of reviewing the error. "Both are improper, but only the former rise[s] to the level of

constitutional error." *Burke*, 163 Wn.2d at 255 (Madsen, J., dissenting). When the State

makes a direct comment on the right to remain silent, the court applies the constitutional

harmless error standard. *Romero*, 113 Wn. App. at 791. On the other hand, a reference

or indirect comment does not generally rise to the level of a constitutional error, and the

defendant bears the burden of showing prejudice. *Lewis*, 130 Wn.2d at 706-07; *Burke*,

163 Wn.2d at 216-17. However, in *Romero*, this court took the distinction one step

further and held that even an indirect comment requires application of the constitutional

harmless error standard when the remark was intended to prejudice the defendant or

resulted in the unintended effect of likely prejudicing the defendant. *Id*. at 790-91.

Here, the trial court concluded that the remark by Detective Downing was an

indirect comment on Beal's right to remain silent. This conclusion finds some support in

14

the record.  The offending comment by Detective Downing was: "His response is done—

is he's done talking."  RP at 454.  The comment was not responsive to the prosecutor's

question.  Instead, as the prosecutor later explained, the detective had been told what he

could say in his testimony, the police report suggested a different answer to the question,

and the detective indicated he had lost his place in the report during his testimony.  There

were no other comments suggesting that the detective intended to infer guilt from Beal's

comment.  Nor did the State refer to the detective's comment during the remainder of

trial.  Detective Downing's remark was unresponsive, subtle, and fleeting.

On the other hand, as Beal points out, in *Romero* we held that "*any* direct police

testimony as to the defendant's refusal to answer questions is a violation of the

defendant's right to silence."  *Romero*, 113 Wn. App. at 792.

Ultimately, it is unnecessary for us to decide whether Detective Downing's remark

was a direct or indirect comment on Beal's right to remain silent.  Even if it was an

indirect comment, it had the unintended effect of likely prejudicing Beal and would

therefore be subject to a constitutional harmless error standard.  *Id.* at 790-91.

Under the harmless error standard, the State has the burden of proving that the

constitutional error was harmless beyond a reasonable doubt.  *Id*. at 795.  The State must

convince this court that a reasonable jury would have reached the same result absent the

error because the untainted evidence was overwhelming.  *Id*. at 794-95.

The evidence against Beal was overwhelming. First, it should be noted that neither the State nor Detective Downing made further comments on Beal's termination of the interview, nor is there any allegation that the State inferred that Beal's comment was substantive evidence of guilt. Beal declined an instruction to the jury but at his request, Detective Downing was recalled to the stand and provided correct answers to the same questions without reference to Beal's termination of the interview.

Turning to the evidence at trial, the State produced evidence that Beal harbored anger and resentment toward Schaffer due to their child custody arrangement. In August 2019, during a custody exchange, Beal demanded Schaffer meet him in a park alone and told her that there would be no custody exchange unless he was able to have a one-on-one conversation with Schaffer. Sharp joined Schaffer for the meeting, which angered Beal. During this exchange, police ultimately had to get involved before Beal would release the children to Schaffer.

On the day of the murder, Schaffer was scheduled to pick up her children from Beal and had expressed concern for her safety. After Schaffer texted H.B. and Beal that she was 20 minutes away, Beal left the apartment. A receipt from the coffee shop indicated Beal purchased mochas at 12:30 p.m. Schaffer sent her last text to her daughter at 12:36 p.m., telling her she had arrived. Surveillance video showed Beal in the area of his apartment complex, near Schaffer's car at 12:37 p.m. H.B. testified that it took her father longer than usual to get mochas. Sandra Young indicated that she heard a gunshot

16

while she was getting items out of her vehicle and then saw Beal between Schaffer's vehicle and another vehicle parked on the street.

Police found the firearm and the same type of ammunition used in the murder in Beal's closet. Beal purchased the firearm using a straw purchaser and registered the gun in her name, telling her that the gun was being purchased in part because of the custody dispute. Beal's DNA was on the grip, trigger, textured areas and barrel.

There was no evidence that Schaffer was murdered as part of a robbery. None of her belongings were taken, including her purse and luggage.

Given the State's untainted evidence at trial, Detective Downing's comment on Beal's silence was harmless beyond a reasonable doubt. The evidence against Beal was overwhelming and a reasonable jury would have convicted Beal of the murder of Schaffer absent Detective Downing's comment.

Beal argues that Young's testimony, regarding seeing Beal behind Schaffer's parked vehicle, was not as strong as the State makes it out to be. Beal argues that the testimony is suspect because she did not mention Beal's presence to police at first. Young testified that she did not mention Beal's presence to the police at first because it was not unusual for her to see him in the neighborhood and it "didn't occur to [her]" to mention it. But even without Young's testimony, the State's case against Beal was strong. Further, Young's testimony about why she did not mention Beal at first is plausible and explains her initial omission.

17

Beal also points to the fact that his neighborhood, where Schaffer was killed, was unsafe. Schaffer herself told Sharp in a text message that there were a lot of "sketchy-looking people." RP at 341. This may be true, but it does not explain why none of Schaffer's belongings were taken following her murder, as is the case with a typical robbery. Instead, the fact that nothing of value was taken from Schaffer after her murder supports the conclusion that this was a targeted attack.

Beal next argues that the ballistics analysis is not reliable because Bromberg-Martin, the forensic scientist who conducted the analysis, read a narrative report of law enforcement's theory of the case prior to conducting the analysis, and because his analysis was subjective. However, Bromberg-Martin also testified that "it's generally considered best practice to read through all the administrative documentation as part of a case before you work it." RP at 679. Further, Bromberg-Martin was qualified to give his expert opinion regarding whether Beal's firearm was the one used in Schaffer's murder. Bromberg-Martin had almost ten years of experience, a master's degree, had offered expert testimony at least fifteen times in the past, and had performed well over 1,000 microscopic firearm ammunition comparisons. Thus, though his analysis was subjective, Bromberg-Martin was qualified to give that opinion and his testimony was reliable.

Finally, Beal argues that the evidence against him was not overwhelming because he testified that he did not shoot Schaffer. However, the jury's finding of guilt necessarily meant that they did not find his testimony to be credible. Even considering

18

Beal's challenges to certain aspects of the State's case against him, this court should still conclude that the evidence against him was overwhelming and that Detective Downing's comment was harmless beyond a reasonable doubt.

2.      DENIAL OF MOTION FOR A MISTRIAL

Alternatively, Beal argues that the court abused its discretion in denying Beal's motion for a mistrial because the court recited the incorrect legal standard and because Beal was so prejudiced by Detective Downing's statement that only a new trial could remedy the issue.  We find no abuse of discretion.

A trial court's denial of a motion for a mistrial is reviewed for abuse of discretion. *Lewis*, 130 Wn.2d at 707.  The court should grant a mistrial "only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." *Id*.  The trial court is in the best position to assess the prejudice of a statement.  *Id*.

Here, the trial court researched the law pertaining to comments on a defendant's silence after hearing Detective Downing's testimony.  The court, in analyzing the issue, recited from *Burke*, 163 Wn.2d at 217:

> And I'm quoting from—I think it's page 217: "In circumstances where silence is protected, a mere reference to the defendant's silence by the government is not necessarily a violation of this principle. However, when the state invites the jury to infer guilt from the invocation of the right to remain silent, the Fifth Amendment and Article I, Section 9, of the Washington Constitution are violated."

19

RP at 517-18. The court ultimately decided that Detective Downing's comment was a reference to Beal's desire not to answer further questions and instructed the State to not instruct the jury to infer guilt from it. The court also allowed Detective Downing to be recalled in order to responsively answer the State's questions and to correct the record.

Contrary to Beal's argument, the court did not cite an incorrect legal standard. *Burke* is the most recent Supreme Court decision on this issue and is good law. While the trial court did not analyze the issue using the entire *Romero* framework, its reliance on *Burke* was not untenable. Other than Detective Downing's improper comment, Beal does not point to any other prejudice from the remark. Just as we find that the error was harmless beyond a reasonable doubt, we conclude that the trial court did not abuse its discretion by relying on *Burke* in denying Beal's motion for a mistrial.

3. LIFETIME NO CONTACT ORDER

Beal argues that the trial court erred when it imposed a lifetime no contact order between him and his children.

Pursuant to RCW 9.94A.505(9), a trial court may impose "crime-related prohibitions" as a sentencing condition. *State v. Torres*, 198 Wn. App. 685, 689, 393 P.3d 894 (2017). A trial court's imposition of a sentencing condition is reviewed for an abuse of discretion. *Id*. A causal connection between the condition imposed and the crime committed is not necessary so long as the condition relates to the crime's circumstances. *State v. Llamas-Villa*, 67 Wn. App. 448, 456, 836 P.2d 239 (1992). "A

no contact order is a crime-related prohibition." *State v. Howard*, 182 Wn. App. 91, 101, 328 P.3d 969 (2014).

"Sentencing conditions that interfere with a fundamental right must be sensitively imposed so that they are 'reasonably necessary to accomplish the essential needs of the State and public order.'" *Id.* (quoting *State v. Warren,* 165 Wn.2d 17, 32, 195 P.3d 940 (2008)). "Parents have a fundamental [ ] interest in the care, custody, and control of their children." *State v. Ancira*, 107 Wn. App. 650, 654, 27 P.3d 1246 (2001). A court can impose a condition on a criminal defendant that restricts the fundamental right to parent as long as "the condition is reasonably necessary to prevent harm" to the child. *Id*.

The State contends that Beal cannot raise this sentencing issue for the first time on appeal. However, the record suggests that Beal *did* object to the no-contact order below. "THE COURT: All right. And then he—there's an objection to the no contact with the children. [H.B.] is apparently an upcoming witness in a case?" RP at 861.

At sentencing, H.B. stated that she did not wish to have contact with Beal, but there was no information regarding whether N.B. wanted to have contact with his father. The court requested that counsel follow up with N.B. about his wishes regarding contact. After imposing the no-contact order between Beal and the children, the court stated that it would reconsider the order with regard to N.B. depending on what he wishes.

The court did not acknowledge Beal's fundamental right to parent or analyze whether the no-contact order was reasonably necessary to prevent harm to the children.

21

*Torres*, 198 Wn. App. at 690; *State v. Peters*, 10 Wn. App. 2d 574, 584, 455 P.3d 141 (2019). Given the rights at stake, we remand for the trial court to consider whether the no-contact order is necessary to protect the children from harm, the impact on Beal's fundamental right to parent, and to consider N.B.'s wishes regarding contact with his father.

4.      CRIMINAL FILING FEE

Beal contends that the court erred when it imposed the $200 criminal filing fee, a discretionary LFO, on Beal. RCW 36.18.020(2)(h). Because Beal failed to object, we decline to address the issue.

A trial court may not impose discretionary costs on indigent defendants. RCW 10.01.160(3). Pursuant to RCW 36.18.020(2)(h), a criminal filing fee may not be imposed on a defendant who is indigent as defined in RCW 10.01.160(3). Under RCW 10.01.160(3), a defendant is indigent if they meet the criteria specified in RCW 10.101.010(3)(a) through (c) (among other definitions).

Here, Beal did not object to the imposition of LFOs at sentencing. In fact, he affirmatively disclaimed any objection to the LFOs, including the criminal filing fee:

> [BEAL'S ATTORNEY:] In addition, your Honor, *we don't have objections to most—to the 36 months of community custody, the LFOs.* Mr. Beal is objecting to the victim compensation restitution. So I've just noted that on the order for restitution.

RP at 860 (emphasis added). The record does not indicate Beal's finances at the time of sentencing.

22

Under RAP 2.5, this court may refuse to review any claim of error not raised at the trial court level. The only exceptions are for claimed errors of lack of jurisdiction, failure to establish facts upon which relief can be granted, and manifest error affecting a constitutional right. RAP 2.5(a). Beal does not argue that any exception to RAP 2.5 applies on appeal.

5.    STATEMENT OF ADDITIONAL GROUNDS

SAG No. 1

Beal first challenges the admissibility of the ballistics evidence matching his firearm to the bullet used to kill Schaffer. Beal concedes that ballistics analysis is admissible but argues that Bromberg-Martin's testimony was inadmissible in this case. Beal's argument does not have merit.

Beal contends that Bromberg-Martin's testimony "was a clear violation of the first point in the *Daubert*[4] checklist" because his opinion was subjective. He also argues that the testimony was inadmissible because Bromberg-Martin did not provide a margin of error because he only used a microscope for visual comparison between the test-fired bullets and the actual bullet used to kill Schaffer and because he read the police narrative report before examining the bullets. Beal also argues that the testimony was inadmissible under ER 702.

---

[4] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

23

Beal raises the admissibility of Bromberg-Martin's testimony for the first time on

appeal. Thus, we may decline to address the issue. *See* RAP 2.5(a). The record reflects

that Beal did request a *Frye*[5] hearing "to at least recognize that this is a subjective way of

testing." RP at 98. The court denied the request for a *Frye* hearing but told Beal's

counsel that she could challenge the expert's opinion during cross-examination. Beal did

just that on cross-examination but lodged no objections to any portion of Bromberg-

Martin's testimony. Despite the lack of objection, we consider the issue.

First, it should be noted that Washington adheres to the *Frye* standard for

admissibility, not *Daubert*. *State v. Copeland*, 130 Wn.2d 244, 251, 922 P.2d 1304

(1996). Next, Bromberg-Martin's testimony in the form of an opinion was in line with

the requirements of ER 702. The rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise.

ER 702. Thus, Beal's argument that the subjective nature of Bromberg-Martin's

testimony rendered it inadmissible fails.

Beal next argues that Bromberg-Martin's inability to provide a margin of error

rendered his testimony inadmissible. He contends that his attorney was unable to refute

Bromberg-Martin's testimony without an applicable margin of error. Beal does not cite

---

[5] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

any rule of law that stands for the proposition that an expert opinion needs to provide a margin of error in order for testimony to be admissible.

Notwithstanding, Bromberg-Martin *was* cross-examined regarding the certainty of his analysis. Bromberg-Martin conceded that there is "a small amount of variance even shot to shot with the same gun. If 100 percent of one item agreed with another one, that would be really unusual or atypical." RP at 683. The defense was able to highlight the fact that Bromberg-Martin could not be 100 percent certain that the bullets matched.

Beal's arguments regarding Bromberg-Martin using only a microscope for visual comparison and his reading of the police narrative report before conducting his analysis are unsupported. He does not explain how these things render Bromberg-Martin's testimony inadmissible and he does not cite any rule of law to support his position.

SAG No. 2

Beal next challenges the "excessive media" presence during his criminal proceedings and argues that it violated his constitutional right to an impartial jury because he was not given an opportunity to "contribute" to the media's "narrative." He also argues that the trial transcript is inaccurate because it does not include off-the-record conversations. We reject this argument as well.

Under article I, section 22, a criminal defendant is entitled to a "public trial" and "the right to an impartial jury." These are related but distinct rights. *State v. Momah*, 167 Wn.2d 140, 152, 217 P.3d 321 (2009). "The 'impartial jury' aspect of article I,

section 22, focuses on the defendant's right to have unbiased jurors, whose prior knowledge of the case or prejudice does not taint the entire venire and render the defendant's trial unfair." *Id.* "Thus, voir dire is a significant aspect of trial because it allows parties to secure their article I, section 22 right to a fair and impartial jury through juror questioning." *Id.*

Beal does not provide any evidence demonstrating that his right to an impartial jury was violated. Instead, he makes general statements like: "it can be reasonably assumed" that the media would not affect the jury pool. Beal does not point to any specific juror in arguing that the jury pool was tainted nor does he contend that voir dire was insufficient to test the jury for bias. Consequently, Beal is unable to demonstrate how the media's coverage of his case violated his constitutional rights.

Beal also argues that the trial transcript is inaccurate. He states that his appellate attorney advised him that there were no audio or video recordings of his trial but that there was instead a verbatim report of the proceedings. Beal states that his attorney's statement was "absolutely false." SAG at 14. He also contends that off-the-record arguments were not contained in the trial transcript and that these arguments had merit.

The connection between Beal's argument related to the trial transcript and his contention that his constitutional right to an impartial jury was violated is unclear. To the extent that Beal is arguing that the verbatim report of proceedings is inaccurate or

26

incomplete, we decline to consider the argument because it relies on evidence outside the record.

In sum, we affirm Beal's conviction for first degree murder, but remand for the sole purpose of instructing the sentencing court to consider whether the lifetime no-contact orders protecting his children are necessary to protect them from harm in light of the children's wishes and Beal's fundamental right to parent his children.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Birk, J.[*]

---

[*] The Honorable Ian S. Birk is a Court of Appeals, Division One, judge sitting in Division Three pursuant to CAR 21(a).